FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION
OF ROCHESTER *v*. CHARTER APPRAISAL
COMPANY, INC.
(SC 16001)

Norcott, Katz, Palmer, McDonald and Peters, Js.

Argued October 28, 1998—officially released February 2, 1999

*Stuart D. Rosen*, with whom was *Ann M. Siczewicz*, for the appellant-appellee (substitute plaintiff Marine Midland Bank).

*Michael F. Dowley*, with whom, on the brief, was *Frank C. White, Jr.*, for the appellee-appellant (defendant).

*Opinion*

PETERS, J. The principal issue in this case is the extent of the liability of a negligent appraiser of real property. Specifically, we must determine whether an appraiser whose negligence results in an excessive valuation of property to be mortgaged bears responsibility for a general decline in real estate values that further decreases the market value of the negligently appraised property.

The plaintiff, First Federal Savings and Loan Association of Rochester, now known as Marine Midland Bank (bank),[1] filed a complaint alleging that the negligence of the defendant, Charter Appraisal Company, Inc. (appraiser), had caused the bank to sustain damages resulting from its reliance on the appraiser's negligent overvaluation of certain residential property.[2] Finding that the appraisal had been conducted negligently, the trial court excluded from the damages award any loss due to the diminution of the property value that had occurred because of changes in the real estate market. With this limitation, it rendered judgment for the bank.

Both parties appealed. The bank challenged the methodology that the trial court used to calculate the damages. The appraiser cross appealed, asserting the insufficiency of the evidence to support a finding of negligence and the allegedly improper dismissal of its claim that the bank had failed to mitigate its damages. Although the appeals properly were filed in the Appellate Court, we transferred them to this court pursuant to

[1] First Federal Savings and Loan Association of Rochester merged into Marine Midland Bank on March 1, 1997. The bank then was substituted as the plaintiff.

[2] Prior to the trial, the court, *Walsh, J.,* struck a second count alleging that the rendering of the overinflated appraisal constituted an unfair and deceptive act in violation of the Connecticut Unfair Trade Practices Act. General Statutes § 42-110a et seq. No appeal has been taken with regard to that decision.

Practice Book § 65-1 and General Statutes § 51-199 (c).[3] We affirm the judgment of the trial court.

The trial court's memorandum of decision and the record as a whole disclose the following facts. Joseph Derby and Hope Sorenson (borrowers), sought a $380,000 mortgage loan from a local mortgage company, the Sanborn Corporation (Sanborn), to refinance an existing mortgage loan on their residence in Bloomfield (property). On the same day that Sanborn agreed to the refinancing, Sanborn negotiated the promissory note and assigned the mortgage to the bank, pursuant to a long-standing correspondent lending relationship.

Under the relationship between Sanborn and the bank, if Sanborn originated mortgage loans conforming with the bank's standards, the bank would purchase such loans from Sanborn. It was Sanborn's responsibility to provide the bank with an appraisal of the property to be mortgaged. The bank then would evaluate the prospective mortgage loan application. Only after the bank had agreed to underwrite the mortgage loan, would the transaction be finalized between Sanborn and the mortgagor.

Accordingly, in this case, Sanborn hired the appraiser to place a value on the borrowers' property that was to serve as security for the mortgage loan. The appraiser estimated the property's value to be $550,000. Sanborn provided the appraisal to the bank so that the bank could decide whether to underwrite the mortgage loan. The appraiser knew that the bank was the intended purchaser of the promissory note[4] and the mortgage, and that the bank would rely on the appraisal in deciding

---

[3] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

[4] The borrowers' promissory note, endorsed by Sanborn to the order of the bank, provided for the payment of principal and interest and, upon default, for the borrowers' liability to the holder of the note for all the outstanding principal, accrued interest and late charges.

whether to underwrite, and ultimately to purchase, the mortgage loan.[5]

The bank evaluated the proposed mortgage loan under its guidelines directing that a loan amount not exceed 75 percent of the value of the property mortgaged as security. In accordance with those guidelines, the bank decided to underwrite and to purchase the mortgage loan in the amount of $380,000 in reliance on the appraised value of the property of $550,000. Once the bank had decided to underwrite the mortgage loan, Sanborn closed the mortgage loan with the borrowers.

A little more than one year later, the borrowers defaulted on the $380,000 mortgage loan. Thereafter, the bank brought an action for strict foreclosure. On September 19, 1991, the foreclosure court ruled in favor of the bank and the bank obtained title to the property. The court subsequently held the borrowers liable for a deficiency judgment of $86,934.49. In calculating that figure, the court determined that, at the time of foreclosure, the property was worth $350,000 and the borrowers's debt was $423,219.90.[6] The only evidence before the foreclosure court to assist its determination of the property's value was the testimony of the bank's witnesses, including its expert appraiser. The bank sold the property on February 19, 1992, for a net recovery of $189,650.90.

Before instituting the present proceedings, the bank had made no attempt to recover the deficiency judgment from the borrowers. It had not yet decided whether to seek recovery from the borrowers or to sell the deficiency judgment.

---

[5] There is no claim, in this case, that the bank was not the proper party to initiate this litigation.

[6] The trial court also granted the bank postjudgment interest of 10 percent per year, in accordance with General Statutes §§ 52-350f and 37-3a.

Instead, the bank sought to recover damages from the appraiser. Having determined that the appraiser's negligence had caused the bank to purchase the promissory note and mortgage in the amount of $380,000, the trial court found that the bank was harmed by receiving a security for its mortgage loan that was of lesser value than that reported by the appraiser.

In determining the damages to be awarded to the bank, the court took into account evidence that real estate values in Bloomfield had declined by approximately 28 percent between the time the bank had purchased the mortgage loan and the time the property vested in the bank at foreclosure. The court estimated that, if the property had been worth $550,000 as the appraiser had represented, then at foreclosure the property's value would have declined to $396,000, as compared to the actual value of $350,000 found by the foreclosure court. The court concluded that the difference between these two values, $46,000, represented the loss that the bank had incurred as a result of the appraiser's negligence.

On appeal, the bank challenges the trial court's determination of damages, arguing that the court deviated from traditional tort principles that permit recovery of all the losses proximately caused by negligent conduct. Specifically, the bank maintains that the trial court improperly: (1) excluded from the damages award the bank's loss arising from the decline in the real estate market; (2) excluded the loss the bank incurred after the bank acquired title to the property; and (3) failed to award prejudgment interest on the damages for the period between the foreclosure judgment, when the bank's damages were fixed, and the trial judgment.

In its cross appeal, the appraiser raises three issues. It contests: (1) the sufficiency of the evidence to support the trial court's findings of negligence and reliance; (2)

the court's failure to find a breach of the bank's duty to mitigate damages; and (3) the court's inclusion of amounts representing interest and fees in its award of damages.

We are not persuaded by either party's appeal. Accordingly, we affirm the judgment of the trial court.

## I

## DAMAGES FOR NEGLIGENT APPRAISAL

We turn first to the bank's claim that the trial court, in its calculation of damages, improperly disregarded applicable principles of tort law. According to the bank, the court failed to compensate it for all the proximately caused losses that it sustained. We disagree.

Before we reach the merits of the bank's claim, we must determine the applicable standard of review. The scope of our review depends upon the proper characterization of the rulings of the trial court. *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992). The appraiser argues that we must uphold the trial court's damages award, which was based on findings of fact that are largely within the trial court's discretionary authority, unless the award was clearly erroneous, unjust or unreasonable. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 28, 664 A.2d 719 (1995); *Dunstan* v. *Round Hill Dairy, Inc.*, 128 Conn. 300, 302–303, 22 A.2d 631 (1941). In this case, although the bank frames its argument as a challenge to the damages calculation, the parties do not dispute the facts underlying the damages award, but rather, they dispute the extent of the bank's loss for which the appraiser should be legally responsible. This is a question of law, subject to plenary review on appeal. See *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994).

The bank's argument of law invokes the well established proposition that a tortfeasor is liable for all damages proximately caused by its negligence. See *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986). The bank claims that, because the appraiser caused it to purchase the mortgage loan secured by the borrowers' property, the appraiser should be liable for all of the bank's loss arising from its relationship to the property, including loss resulting from the property's devaluation as a result of a market decline.

Because actual causation, in theory, is virtually limitless, the legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be held liable for the consequences of their actions. *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 605–606, 662 A.2d 753 (1995). The fundamental inquiry of proximate cause is whether the harm that occurred was within the scope of foreseeable risk created by the defendant's negligent conduct. *Doe* v. *Manheimer*, 212 Conn. 748, 758, 563 A.2d 699 (1989). In negligence cases such as the present one, in which a tortfeasor's conduct is not the direct cause of the harm, the question of legal causation is practically indistinguishable from an analysis of the extent of the tortfeasor's duty to the plaintiff.[7] See *Lodge* v. *Arett Sales*

---

[7] As Professors William L. Prosser and W. Page Keeton have stated: "It is quite possible to state every question which arises in connection with 'proximate cause' in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur? . . . The question whether there is a duty has most often seemed helpful in cases where the only issue is in reality whether the defendant stands in any such relation to the plaintiff as to create any legally recognized obligation of conduct for the plaintiff's benefit. Or, reverting again to the starting point, whether the interests of the plaintiff are entitled to legal protection at the defendant's hands against the invasion which has in fact occurred. Or, again reverting, whether the conduct is the 'proximate cause' of the result. The circumlocution is unavoidable, since all of these questions are, in reality, one and the same." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 42, p.

*Corp.*, 246 Conn. 563, 574, 717 A.2d 215 (1998). Because our analysis is clarified by examining the scope of the appraiser's duty to the bank,[8] we begin there.

"The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 385. Essential to determining whether a legal duty exists is "the fundamental policy of the law" that a tortfeasor's responsibility should not extend to the theoretically endless consequences of the wrong.[9] Id., 386. Even where harm was foreseeable, this court has found no duty when the nexus between a defendant's negligence and the particular consequences to the plaintiff was too attenuated. *Waters* v. *Autuori*, 236 Conn. 820, 836, 676 A.2d

274; see *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 387–88 and n.4.

[8] Commentators believe that evaluating the scope of a defendant's duty (as compared to proximate causation) allows greater clarity and more precise formulation of the issues in cases involving an intervening cause, such as the drop in market values here. 4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 20.5, pp. 150–51 n.33. Evaluating a question of liability in terms of duty may serve to direct attention to policy issues underlying the extent of the original obligation, rather than to the mechanical sequence of events making up cause in fact. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 42, p. 274.

[9] Foreseeability that harm may result if care is not exercised is a necessary component of duty. Foreseeability alone, however, does not create a legal duty. *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 385-86. "Many harms are quite literally 'foreseeable,' yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Citations omitted; internal quotation marks omitted.) Id., 386.

357 (1996) (nexus between accounting standards promulgated by professional regulatory body and investor's economic loss insufficient to create duty of care); *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 387–88 (connection between contractor's negligence and economic loss to injured party's employer owing to increased insurance premiums too attenuated to impose liability).

In the present case, we must determine whether the scope of the appraiser's duty, in providing the valuation of the property, extended to protecting the bank from financial loss due to a general decline in property values. In making this determination, we take as our point of departure the purpose for which the appraisal was sought.

It is undisputed that the bank used the negligently conducted appraisal for the purpose of evaluating the borrowers' mortgage loan application. The bank compared the property's value, as determined by the appraisal, to the $380,000 amount of the requested mortgage loan, and decided to purchase the mortgage loan in large part in reliance on the fact that the value of the securing property met the bank's 75 percent "loan-to-value" ratio guidelines. The trial court found that if the property's value had been $506,660 or more, the bank would have approved the purchase of the mortgage loan in the requested amount of $380,000. The purpose of the appraisal, therefore, was to establish that the borrowers' property provided adequate security for a mortgage loan in the requested amount of $380,000.

Throughout the trial, the bank characterized the purpose of the appraisal in that way. For example, in its posttrial brief, the bank stated: "[T]he risk that the Appraisal was designed to guard against was *not* the possibility of the Borrowers' default, but that, in the event of such default, the Bank would be adequately

secured."[10] (Emphasis in original.) It is no surprise that the trial court found that the harm caused by the negligent appraisal was that the bank received a security of a lesser value than that which the appraiser reported.

In assessing the damages that the bank could recover according to this principle of law, the trial court identified those costs that the bank would have avoided "but for" the negligent appraisal. See *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 234 Conn. 605. The court properly found that, but for the appraiser's negligence, the bank would not have purchased the mortgage loan in the amount of $380,000.

The court declined to accept the bank's argument that it was entitled to greater damages. We agree with the court's ruling because the appraisal was intended to demonstrate that the property provided adequate security for the $380,000 mortgage loan, rather than to assure the bank that the borrowers were not likely to default. The appraiser's duty to the bank in conducting the appraisal, in these circumstances, did not extend to protecting the bank from loss arising from a subsequent general decline in real estate values, even if such a decline had been foreseeable. The link between the negligent appraisal, the consequent impairment of the bank's security, and a general fall in market values is too attenuated to have created a duty for the appraiser to protect the bank from a general market decline. See *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 387–88. Put differently, a fall in market values was not within the scope of risk created by the negligently conducted appraisal. The court properly excluded, from the

---

[10] In its trial briefs, the bank asserted that the risk created by the appraiser's negligence, and the harm that in fact occurred, was the undercollateralization of the loan, and that the appraisal's purpose was to minimize the risk of loss to the bank in the event of the borrowers' default.

The bank's complaint does not illuminate this question because it alleged only generally that the bank had "sustained damages."

damages recoverable by the bank, losses attributable to the general decline in real estate values in Bloomfield between the time of the purchase of the loan and the time of the vesting of title in the bank as a consequence of the bank's foreclosure action.

In its renewed argument to the contrary, the bank maintains that there is an inconsistency between the court's finding of reliance and its limitation on the bank's recoverable damages to exclude loss from the decline in real estate values. That perceived inconsistency arises because the bank construes the trial court's finding to include more than that which it says, which is, that the bank would not have purchased a mortgage loan for $380,000 secured by property negligently alleged to have a market value of $550,000. The bank argues that it would not have had any relationship to the borrowers or to their property if the appraisal had not been performed negligently, thus inferring that the court found that the bank would not have purchased a mortgage loan *in any amount*, even a lower face amount, secured by property with a lower valuation.

Such an inference is not contained in the trial court's finding. The trial court found only that the bank would not have purchased the mortgage loan "*in that amount*," that is, $380,000. (Emphasis added.) The court explicitly left open the question of whether the parties would have agreed to a mortgage loan in a lesser amount. We do not have the authority to find or to supplement the facts found by a trial court. To the extent that the narrowness of the finding creates a gap in the record, the responsibility for the gap rests with the bank. As the plaintiff in the action, the bank bore the burden of proving that the appraiser's actions were the proximate cause of its losses. *Fleming* v. *Garnett*, 231 Conn. 77, 85, 646 A.2d 1308 (1994); *Wu* v. *Fairfield*, 204 Conn. 435, 438, 528 A.2d 364 (1987).

The evidence presented by the bank at trial supports a narrow reading of the trial court's finding. The bank's officers and documents indicated that the bank had decided to purchase the $380,000 mortgage loan on the basis of guidelines that evaluated the borrowers' equity through a 75 percent loan-to-value ratio. The guidelines that the bank used to evaluate the mortgage loan gave the most weight to two factors: the loan-to-value ratio, as applied to the appraised value of the property, and the borrowers' credit history. The guidelines gave less weight to the borrowers' income, an item that had to be reported but was not routinely verified. The bank's chief underwriter testified that the borrowers had "excellent credit," and that the borrowers' credit report would have inclined the bank to purchase their mortgage loan. This evidence does not support a contention that, had the appraisal accurately reflected the value of the property, the bank would not have purchased a mortgage loan in a different amount secured by the borrowers' property. To the contrary, it suggests that, with the proper loan-to-value ratio, a mortgage deal might have been struck at the lower loan amount that an accurate appraisal would have put on the table.

In sum, the basis for the bank's objection to the trial court's measurement of its damages is founded on a false premise of inconsistency. The appraiser's duty to the bank did not extend to protecting it from a loss due to a decline in market values under the circumstances of this case. The court's decision to exclude losses measured by the general decline in property values is not foreclosed by its finding that the bank would not have purchased the mortgage loan but for the negligent appraisal. In the absence of a finding that the bank would not have purchased *any* mortgage loan secured by the property valued at other than $550,000, we conclude that it was not improper for the trial court to

exclude losses arising from a general market decline from the damages to which the bank was entitled.

## II

## TIME FOR EVALUATION OF REAL PROPERTY

We next consider the bank's claim that the trial court improperly based its calculation of damages on the value of the property at the time that title vested in the bank, as determined in the foreclosure proceedings. We reject the bank's contrary assertion, that the value of the property should have been measured at the time of its resale to a third party.

The bank contends that the proper measure of its losses due to the negligent appraisal is based not on $350,000, the value of the property as appraised at foreclosure, but on $189,650.90, the amount of the bank's net recovery from the sale of the property to a third party. The bank argues that using the foreclosure judgment figure does not measure its loss fully, because its loss continued to grow after the date of foreclosure. The bank argues further that it had no choice but to seek strict foreclosure on the property in order to establish its injury and to mitigate its damages.

We are not persuaded. The bank's foreclosure judgment converted the borrowers' debt into real property worth $350,000 and a deficiency judgment of $86,934.49. By statute, the deficiency judgment fixed the borrowers' obligation to the bank under the promissory note. General Statutes § 49-14 (a).[11] The bank has offered no rea-

---

[11] General Statutes § 49-14 (a) provides in relevant part: "At any time within thirty days after the time limited for redemption has expired, any party to a mortgage foreclosure may file a motion seeking a deficiency judgment. Such motion shall be placed on the short calendar for an evidentiary hearing. . . . At such hearing the court shall hear the evidence, establish a valuation for the mortgaged property and shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim. The plaintiff in any further action upon the debt, note or obligation, shall recover only the amount of such judgment."

son of policy why this statutory policy should not be applied in evaluating the common-law obligations of a negligent third party appraiser. See *Fahy* v. *Fahy*, 227 Conn. 505, 509, 514, 630 A.2d 1328 (1993).

It is telling, moreover, that neither the appraiser nor the foreclosure court had any control over what the bank did with the property subsequent to the strict foreclosure proceedings. The bank had unfettered and unsupervised discretion to choose both the time for the sale of its property and the terms and conditions of the contract of sale. The consequences of the bank's exercise of this discretion cannot be visited upon the appraiser under the circumstances of this case.

Finally, the bank argues that the appraiser's liability continues until the property's sale because, as we have already discussed in part I of this opinion, the bank maintains that no purchase of any promissory note and mortgage would have taken place except for an accurate appraisal in the amount of $550,000. Having rejected that argument as unproven, we conclude that the trial court correctly determined that the bank's damages were fixed at the time of strict foreclosure, when it gained title to the property.

## III

### PREJUDGMENT INTEREST

We next consider the bank's claim that its damages award should have included prejudgment interest. The bank asserts that the appraiser should be responsible for compensating the bank for its loss of the use of its money from the date the damages were fixed at the foreclosure proceedings, September 19, 1991, through the date of the trial court's judgment in the present action, July 17, 1997.

We know of no rule, and the bank has cited none, that requires that such interest be awarded. As the bank

recognizes, " '[t]he determination of whether or not interest is to be recognized as a proper element of damage is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.' " *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.*, 138 Conn. 458, 463, 85 A.2d 907 (1952). Exercising its discretion, the trial court decided not to award interest on the damages award, because it found that, in light of the complexity of the issues, the case could not have been resolved without a full trial. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 28, 38. We conclude that the trial court did not abuse its discretion and, accordingly, that its decision should be upheld.

## IV

### CROSS APPEAL

We now turn to the appraiser's arguments in its cross appeal. These arguments, in large part, challenge the factual underpinnings of the trial court's judgment. We find none of the appraiser's arguments to be persuasive.

### A

The appraiser first maintains that the trial court did not have sufficient evidence to support its finding that the appraisal report was negligently prepared. The appraiser finds fault with the trial court's finding, according to the expert testimony at trial, that the appraisal deviated from the professional standard of care in several specific ways.

The trial court found that the property had not been evaluated properly because the appraisal: (1) included lower-level bedrooms in calculating the total above grade (ground) living space;[12] (2) failed to report on the

---

[12] *Lower-level bedrooms:* The borrowers' property consisted of a house located on a sloped lot. The appraisal deviated from professional appraisal guidelines by describing two bedrooms located on the lower level of the

sale of a comparable residence on the same street;[13] and (3) failed to identify the sale of a comparable lot in assessing the property's land value.[14] In light of the ample record at trial, which need not be rehearsed

property as above grade rooms, by including these bedrooms in the calculation of gross living area, and by comparing this property with other houses that had aboveground bedrooms.

We disagree with the appraiser's contention that the experts' testimony should have been disregarded because they relied on external viewing of the property and on photographs.

We also disagree with its construction of the expert testimony as permitting deviations for the lower-level rooms without an express inclusion of a substantial explanation for such a deviation in the appraisal report.

Finally, we note that the inadequate disclosure of the location of the lower-level bedrooms affected not only the overall evaluation of the property but also the properties upon which the appraiser relied by way of comparison. The trial court found that the appraiser, without special comment, compared the borrowers' property to other residences with bedrooms above ground.

[13] *Comparable sales:* The appraisal reported the sales of three comparable properties, located one-half to one mile from the property. The three reported comparables had 3317, 3469 and 3418 square feet of gross living area above ground. The borrowers' property, as appraised, had only 2558 square feet of gross living area above ground; excluding the lower-level bedrooms would have lowered this figure to just over 1800 square feet. The bank had requested additional comparables from the appraiser. Even so, the appraiser failed to report a substantially similar residence, located on the same road as the borrowers' property, with 1847 square feet of living area above ground. That property had sold for $252,500 two months before the appraisal. The bank's expert testified that this was an excellent comparable, which the appraiser had a professional obligation to report.

On the cross appeal the appraiser seems to argue that the evidence did not in fact show that this unreported residence was a good comparable. We are unpersuaded. The appraiser does not contest the qualifications of the bank's expert, and there is no reason why the trial court was not entitled to credit his testimony. The trial court, therefore, had ample evidence that the appraisal's failure to include this comparable property violated the professional standard of care.

[14] *Land value:* The trial court also found that the appraiser's appraisal improperly assessed the land value of the borrowers' property. The court found that the appraiser's failure to identify the sale of a lot of comparable size and location for $82,000, and its decision, instead, to state an unsupported figure of $200,000 for the property's land value constituted a deviation from the professional standard of care. The appraiser does not contest that finding on appeal.

further, the appraiser's challenge to the sufficiency of this evidence to support the trial court's findings cannot be sustained.

B

The appraiser also argues that, because the bank failed to produce witnesses who personally had been involved in approving the purchase of the promissory note and mortgage, the trial court had insufficient evidence to find that the bank had relied on the appraisal in entering into this transaction. The absence of direct evidence of such reliance is not crucial, however, because it readily may be established by circumstantial evidence. See *State* v. *Sauris*, 227 Conn. 389, 395–96, 631 A.2d 238 (1993). The court had substantial evidence of the bank's reliance on the appraisal, including not only the guidelines used to evaluate the borrowers' mortgage loan application, but also the testimony of the bank's chief underwriter at the time the mortgage loan was approved.

The appraiser argues further that the trial court improperly failed to draw an adverse inference from the bank's failure to call, as a witness, a particular underwriter who had direct knowledge of the bank's alleged reliance. The bank explained the absence of that witness at trial. More fundamentally, the appraiser has not demonstrated that the trial court did not draw such an inference. Accordingly, we decline to consider this claim on appeal. See *Matza* v. *Matza*, 226 Conn. 166, 187, 627 A.2d 414 (1993) (" '[w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment' "). We find no reason to overturn the trial court's finding that the bank relied on the negligently conducted appraisal.

C

We next consider the appraiser's claim that the trial court improperly found that the bank adequately had

fulfilled its duty to mitigate its damages. The appraiser claims that the bank should have been held in breach of this duty because it failed to pursue payment of the deficiency judgment from the borrowers. We disagree.

The appraiser argues, and the bank does not contest, that evidence at trial demonstrated that the bank had taken no action to pursue payment from the borrowers and that the bank had not yet decided whether to pursue the deficiency judgment or to sell it. The trial court further determined, however, that the bank was not required to pursue the borrowers in the circumstances of this case. One of the borrowers had gone into bankruptcy. The other, according to the court, had not been shown to have the ability to pay.

On the present state of the record, we agree with the trial court's conclusion that the appraiser failed to satisfy its burden of proving that the bank had failed to take reasonable efforts to mitigate its damages. See *Preston* v. *Keith*, 217 Conn. 12, 16 and n.5, 584 A.2d 439 (1991). The only evidence with respect to the non-bankrupt borrower that was proffered by the appraiser was out of date. It described only income earned at the time the mortgage loan was granted, three years prior to the deficiency judgment and seven years before the trial in this case. The appraiser has cited no further evidence that the trial court should have considered.

D

Finally, we consider the appraiser's claim that, in assessing damages, the trial court improperly included not only the bank's loss of the principal amount of the promissory note, but also its loss of interest and late charges on the mortgage loan. The appraiser observes, as the evidence shows, that, in evaluating the mortgage loan application, the bank focused on the relationship between the value of the property and the principal amount of the mortgage loan. Accordingly, in the

appraiser's view, the appraiser's negligence had no bearing on the bank's loss beyond the principal amount of the promissory note.

The appraiser's argument is insupportable. The appraiser cites no legal authority for its position, and cites no evidence that the bank's considerations, in evaluating the mortgage loan application, excluded protection for loss of interest and late charges. In common understanding, loan transactions routinely contain provisions for such charges. The appraiser does not claim to have been unaware of this custom and usage. If a fundamental assumption about a loan transaction is incorrect, a resultant loss foreseeably may include the loss of interest and late charges. The appraiser does not contest that it was aware of these components of the mortgage loan here. We conclude that it was not improper for the trial court to include the bank's loss of interest and late charges in the damages award.

V

We have examined carefully the claims raised by the bank and by the appraiser. None of them warrants correction of any of the findings or conclusions of the trial court.

The judgment is affirmed.

In this opinion the other justices concurred.