CARLO VONA ET AL. *v.* EDWARD N. LERNER ET AL.
(AC 20823)

Foti, Dranginis and Stoughton, Js.

Argued March 26—officially released September 10, 2002

*Thomas E. Minogue, Jr.*, with whom, on the brief, were *Jonathan D. Elliot* and *Sabato P. Fiano*, for the appellants (plaintiffs).

*Mark J. Bunim*, with whom were *Maria J. Rivera* and, on the brief, *Daniel P. Waxman* and *Linda H. Kolodny*, for the appellee (defendant Edward N. Lerner).

*Mary A. Gambardella*, with whom, on the brief, were *Mark J. Goldberg* and *Steven J. Younes*, for the appellee (defendant Brown, Paindiris and Zarella, LLP).

DRANGINIS, J. The principal issue in this professional negligence action against a lawyer, his partners and their law firm is whether the trial court properly directed a verdict for the defendants where the plaintiff presented no expert testimony as to the defendants' alleged breach of the standard of care that proximately caused the plaintiffs' alleged loss or damages. We conclude that, in the absence of such testimony, the court may properly direct a verdict in favor of the defendants. See *Davis* v. *Margolis*, 215 Conn. 408, 416, 576 A.2d 489 (1990).

The claims of the plaintiffs, Carlo Vona (Vona) and his wife, Grace Vona, arise out of a real estate transaction in which the defendant Edward N. Lerner, an attorney licensed in Connecticut, represented them in the acquisition of certain real property in Greenwich in 1989.[1] Following the presentation of the plaintiffs' case, the defendants filed a motion for a directed verdict that was granted by the court. On appeal, the plaintiffs claim that the court improperly (1) directed the verdict, (2) found that the plaintiffs had unclean hands and based the directed verdict on that finding, and (3) interpreted and applied case law. We affirm the judgment of the trial court.[2]

The following facts are relevant to the plaintiffs' appeal. Vona is a masonry contractor and real estate developer who, with his wife, over time, acquired a

---

[1] The other defendant is the law firm Brown, Paindiris and Zarella, LLP (firm), of which Lerner was a partner at the time of his allegedly improper actions. The plaintiffs also named the individual partners of the firm. The third party defendants, Neil Berkow and Berkow Schecter and Company, are not parties to this appeal.

[2] Because we conclude that the court properly directed the verdict due to the absence of expert testimony that the defendants' actions were the proximate cause of the plaintiffs' alleged loss and damages, we need not reach the plaintiffs' other claims.

number of rental properties, primarily in Norwalk. The plaintiffs attended real estate closings with respect to the properties they acquired and were familiar with mortgages. At different times, they retained the services of a variety of lawyers, including Lerner, to represent them when they acquired real property. At the time in question, the plaintiffs had assets in excess of $20 million.

In the 1970s, through his masonry business, Vona met Gene L. Simms, a real estate developer who built speculative houses. The two men developed close personal and professional relationships. Vona referred to Simms as "pop," and the two men spoke to one another daily. They formed Simms-Vona Partnership through which they acquired, developed and sold real property. The two men were known to conduct their real estate business on a handshake. Simms found real estate with investment potential, and Vona provided the financial support needed to make the investment. Occasionally, Simms and Vona borrowed money to finance their real estate purchases and signed mortgage notes.[3]

In the early 1980s, Simms retained Lerner to be his personal attorney. In 1986, Simms introduced Vona to Lerner. Subsequently, Lerner provided legal services, jointly and individually, for both Simms and Vona in regard to various partnerships and real estate transactions. He also represented Simms in business transactions that did not involve Vona.

Simms had another business partner by the name of Peter M. Gandolfo (together sellers). In the early 1980s, the sellers acquired land at 961 North Street in Greenwich (property) on which they constructed a speculative luxury house of contemporary design. Lerner represented the sellers when they obtained construc-

___

[3] Apparently, at some time after the events giving rise to this action, Simms and Vona had a parting of the ways.

tion financing for the property. The construction was finished in the mid-1980s, and the property was listed for sale at $2.6 million. The sellers were not able to sell the property, which was encumbered by two mortgages in the principal amount of $1,735,000. In 1989, the sellers were no longer able to meet the monthly mortgage payments and other costs related to the property. Furthermore, the second, smaller mortgage in the principal amount of $235,000 was due to mature in January, 1990.

During the summer of 1989, Simms proposed to Vona that Vona obtain $2 million in financing from a bank (Vona mortgage), take title to the property and sell it. As consideration for title to the property, Vona would forgive certain business debts that Simms owed him. According to their plan, Vona would not have to expend any of his own funds on the transaction or the property. The sellers intended to use part of the $2 million loan to pay off the existing mortgages and the remaining cash to pay the debt service on the Vona mortgage until Vona was able to sell the property. Vona was willing to accept Simms' proposal because Simms was his friend and he naturally would do a favor for his friend. He had lent him money in the past. In addition, Vona thought that he would make a profit reselling the property, recoup the money Simms owed him and obtain tax benefits from the mortgage.[4]

Vona and Simms both wanted to use Lerner as their attorney for the transaction and communicated as much to him in August, 1989. They also wanted Lerner to help them secure financing for the transaction. If Lerner was unable to secure financing from a financial institution, the sellers would give Vona a purchase money mortgage so that the transaction could be completed. Lerner was reluctant to represent both Simms and Vona, although

---

[4] The plaintiffs first included payments on the Vona mortgage in their tax returns in October, 1989.

they were both his clients. He advised them to get separate counsel to avoid any potential conflict of interest. Simms and Vona, however, insisted on using Lerner and agreed to sign a waiver of the potential conflict of interest. Lerner never drafted a purchase and sale agreement or memorialized the agreement between Vona and Simms.

Lerner communicated with personnel at People's Bank (bank) to help Vona secure a mortgage in September, 1989. Vona never submitted a written mortgage application, as the bank already had financial information about him from a recent previous transaction that did not materialize. Berkow, Vona's accountant, had provided information for the failed transaction and provided the bank with additional information on September 14, 1989. Vona received a copy of Berkow's letter. The bank obtained an independent appraisal of the property establishing its fair market value as $2.55 million. The bank approved Vona's application for a $2 million mortgage loan on September 20, 1989, and so notified him in writing. According to Vona, however, he does not read his mail. Lerner advised Vona of the approval two days before the title closing and that the bank wanted a deposit relationship with him of at least $100,000.

The closing took place at the bank's Stamford branch on September 22, 1989. The plaintiffs attended the closing along with Lerner, Simms and a bank representative. Although they testified at trial that they did not know that they were attending a closing that day and that they never knew that they needed to make a $100,000 deposit, Grace Vona just happened to have a $100,000 check from her father in her handbag. The sellers had signed a warranty deed to Vona on September 15, 1989,

in the amount of $2.55 million.[5] Grace Vona was a guarantor of the note. Simms and Vona also signed a waiver of conflict letter with respect to Lerner.[6] Following the sale, Simms continued to use and control the property as he had previously.

The sellers paid all of the closing costs and taxes from the loan, paid off the preexisting mortgages and used the balance to pay the monthly payments on the Vona mortgage until March, 1990. At that time, the sellers no longer had funds from the Vona mortgage. Thereafter, Vona paid the monthly payments.[7] Although Vona testified at trial that Lerner had told him that he was only doing Simms a favor, that he never really owned the property and that Simms would take the property back if he no longer was able to pay the Vona mortgage and other costs, Vona continued to pay the mortgage. He never asked Simms to take the property back, and he did not ask the bank to take the property in payment of the mortgage. In 1991, Vona went to the bank with Lerner and Simms to refinance the mortgage. Vona refinanced the property yet again in 1993 without Lerner's assistance. The plaintiffs had assets with which they could have paid off the mortgage at any time.

Throughout the early 1990s, the real estate market in Connecticut declined, and Vona was unable to sell the property until 1996 at the price of $1.25 million. According to Vona's testimony at trial, he participated in the transaction because Lerner asked him to do a favor for Simms, and he understood that the property

---

[5] Sometime after the closing, Vona and Simms met with Lerner to prepare a corrected deed in the amount of $2,250,000. The difference between $2.55 million and $2.25 million apparently was due to a disparity in the amount of debt Simms owed Vona.

[6] Lerner had discussed the conflict issue with his partners, who agreed that Vona and Simms should sign a waiver letter. The partners were aware of the manner in which Simms and Vona conducted their affairs.

[7] Beginning in October, 1989, the plaintiffs included the monthly mortgage payments on their personal income tax returns.

would never present a financial risk to him. Lerner testified that he knew of no agreement between Simms and Vona that Vona would take title to the property without incurring financial obligations, that the sellers would carry the debt service on the Vona mortgage or that the sellers would take the property back at any time.

In 1989, in addition to his financial difficulties related to the property, Simms was engaged in a dispute with another of his business partners, Dale Stein. Stein had invested in another speculative home in Greenwich that Simms was developing. Stein had threatened to place a lien on the property and, prior to September, 1989, commenced legal action against Simms. In February, 1990, Stein impleaded Vona in his action against Simms, claiming that the property had been fraudulently transferred by the sellers to avoid attachment. One of Lerner's partners in the firm defended Vona against the Stein action, which was settled without any contribution from Vona.

In the late spring of 1994, the plaintiffs brought this action against Lerner, his law partners and their firm, alleging negligence, breach of contract and breach of fiduciary duty.[8] Each of the causes of action alleged by the plaintiffs flows from their principal allegations that Lerner was negligent in that he represented both the sellers and the plaintiffs in the transaction related to the property, failed to disclose adequately the conflict of interest inherent in representing both parties in a real estate transaction, failed to obtain the plaintiffs' informed consent before undertaking to represent them, failed to ensure that the sellers legally were obligated to pay the debt service on the Vona mortgage and the expenses of maintaining the property, failed to

---

[8] The complaint was in six counts, three counts against Lerner individually, and three corresponding counts against the partners and the firm.

perform due diligence as to the sellers, misrepresented to the plaintiffs that they could convey the property to the bank at any time to satisfy the Vona mortgage, represented the interests of the sellers over the interests of the plaintiffs, failed to structure the transaction so the plaintiffs had no direct financial obligation with respect to the property and failed to secure a voluntary waiver of the conflict of interest. The plaintiffs claimed that as a result of Lerner's negligence, they suffered financial losses due to carrying the debt service on the property, maintaining the property and selling it for less than the purchase price.

The case was tried before a jury. After the plaintiffs had presented their case, including expert testimony, the defendants filed a motion for a directed verdict, which the court granted. The court articulated its reasons for directing the verdict in a lengthy oral decision.[9] The plaintiffs appealed, claiming that the court improperly granted the motion for a directed verdict.

The standards for reviewing a challenge to a directed verdict are well known. Generally, litigants have a constitutional right to have factual issues resolved by the jury. *Mather* v. *Griffin Hospital*, 207 Conn. 125, 138, 540 A.2d 666 (1988). "Directed verdicts [therefore] are historically not favored and can be upheld on appeal only when the jury could not have reasonably and legally reached any other conclusion." (Internal quotation marks omitted.) *Domogala* v. *Molin*, 57 Conn. App. 525, 527, 749 A.2d 676 (2000). "We review a trial court's decision to direct a verdict for the defendant by considering all of the evidence, including reasonable inferences, in the light most favorable to the plaintiff. . . . A verdict may be directed where the decisive question is one of law or where the claim is that there is insufficient

---

[9] The court signed the transcript of its decision in keeping with Practice Book § 64-1 (a).

evidence to sustain a favorable verdict." (Internal quotation marks omitted.) *Johnson* v. *North Branford*, 64 Conn. App. 643, 645–46, 781 A.2d, 346, cert. denied, 258 Conn. 926, 783 A.2d 1028 (2001).

"If the evidence in a case presents such a situation that the minds of fair and reasonable [jurors] could therefrom reach but one conclusion, there is no question for a jury. The case should be decided by the judge as essentially a question of law, and he may direct a verdict. *Lombardi* v. *J.A. Bergren Dairy Farms, Inc.*, 153 Conn. 19, 23, 213 A.2d 449 [1965]." *Terminal Taxi Co.* v. *Flynn*, 156 Conn. 313, 317, 240 A.2d 881 (1968). "While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . If the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." (Internal quotation marks omitted.) *Sheridan* v. *Desmond*, 45 Conn. App. 686, 691, 697 A.2d 1162 (1997).

The case before us concerns claims of negligence against a lawyer in the conduct of his profession. "[P]rofessional negligence or malpractice . . . [is] defined as the *failure of one rendering professional services* to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." (Emphasis in original; internal quotation marks omitted.) *Trimel* v. *Lawrence & Memorial Hospital Rehabilitation Center*, 61 Conn. App. 353, 357–58, 764 A.2d 203, appeal dismissed, 258 Conn. 711, 784 A.2d 889 (2001).

"In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or

omission; (3) causation; and (4) damages. 4 R. Mallen & J. Smith, Legal Malpractice (4th Ed. 1996) § 32.9, pp. 172–74." *Mayer* v. *Biafore, Florek & O'Neill,* 245 Conn. 88, 92, 713 A.2d 1267 (1998).

"As a general rule, for a plaintiff to prevail in a legal malpractice case in Connecticut, he must present expert testimony to establish the standard of proper professional skill or care. *Dunham* v. *Dunham,* 204 Conn. 303, 317, 528 A.2d 1123 (1987); *Pearl* v. *Nelson,* 13 Conn. App. 170, 173, 534 A.2d 1257 (1988); *Bent* v. *Green,* 39 Conn. Sup. 416, 420, 466 A.2d 322 (1983). The requirement of expert testimony in malpractice cases serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard. *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 617, 356 A.2d 887 (1975); *Decho* v. *Shutkin,* 144 Conn. 102, 106, 127 A.2d 618 (1956); *Bent* v. *Green,* supra." *Davis* v. *Margolis,* supra, 215 Conn. 416. "The true test for the admissibility of expert testimony is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue." (Internal quotation marks omitted.) *Caron* v. *Adams,* 33 Conn. App. 673, 690, 638 A.2d 1073 (1994), quoting *Puro* v. *Henry,* 188 Conn. 301, 309, 449 A.2d 176 (1982).

The following additional facts are necessary for our resolution of the plaintiffs' claims. At trial, Barry Hawkins, an attorney licensed to practice in Connecticut, testified as the plaintiffs' expert witness as to the standard of care applicable to a lawyer conducting a real estate transaction at the time in question. Prior to granting the defendants' motion for a directed verdict, the court obtained and reviewed copies of the transcript of Hawkins' testimony. The court did not address the

elements relating to the standard of care in such circumstances or whether Lerner had breached the standard of care. The court confined its decision to whether there was expert testimony to prove that there was a breach of the standard of care that proximately caused the damages claimed by the plaintiffs. The court specifically found that a number of questions concerning damages were asked of Hawkins, but that he had provided no responses that connected a breach of the standard of care with the damages the plaintiffs claimed.

The other elements of a malpractice action notwithstanding, the plaintiffs' claim here is that the court improperly determined, as a matter of law, that there was insufficient evidence for the jury to conclude that the manner in which Lerner represented the plaintiffs with respect to their purchase of the property was the proximate cause of their alleged financial loss. "To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused the injuries. . . . As [our Supreme Court] observed . . . [l]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation. The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . .

"The second component of legal cause is proximate cause, which [our Supreme Court has] defined as [a]n actual cause that is a substantial factor in the resulting harm . . . . The proximate cause requirement tempers the expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree of certainty." (Internal quotation marks omitted.) *Craig* v. *Driscoll*, 64 Conn. App. 699, 711, 781 A.2d 440, cert. granted on other grounds, 258 Conn. 931, 785 A.2d 228 (2001).

"[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 182, 646 A.2d 195 (1994).

On the basis of our review of Hawkins' testimony, we conclude that the court properly granted the defendants' motion for a directed verdict. All of Hawkins' responses to the hypothetical questions asked of him with respect to the proximate cause of the plaintiffs' alleged damages were based on his personal belief, as opposed to the standard of care, and were conditional or speculative.[10] As we noted in discussing the standard

---

[10] The following portions of the transcript contain the salient portions of Hawkins' testimony with respect to a causal relationship between Lerner's alleged negligence and the plaintiffs' alleged damages. On direct examination by the plaintiffs' counsel, the following occurred:

"[Plaintiffs' Counsel]: . . . What damages do you believe flow from Mr. Lerner's representation of the Vonas in that conflicted setting?

"[The Witness]: He has a real problem that I described earlier when we were talking generically about conflicts, that one of his clients or two of them, in this case Gandolfo and Simms, want to sell a piece of property and the other clients, the Vonas, are being asked to purchase a piece of property. The analysis that I look at is what would be the perspective if they had separate lawyers, if I were the lawyer representing only the Vonas or if [Jonathan D. Elliot] was the lawyer representing only the Vonas, what would be the type of analysis and representation that would be done by a lawyer that was looking out only for their interests. And, if I am representing only the Vonas, I would certainly not be trying to persuade them that it was a good idea or a safe idea to purchase a piece of property that they did not intend to purchase. I wouldn't have any motivation or desire to do that.

"On the other hand, I would have a lot of motivation and desire to try and find out and counsel my clients, why do you want to buy this property if you . . . didn't really want to own and try and ascertain and represent them to find out what was the motivation.

"That's in direct conflict if I have another set of clients in the same transaction that want that result to happen because my duty to that other set of clients would be to make sure that the transaction happened, to give as much possible benefit as I could to making the transaction come together

of review applicable to challenges to directed verdicts, a trial court should direct a verdict in the defendants' favor where there is insufficient evidence to support a verdict favorable to the plaintiffs. See *Johnson* v. *North Branford*, supra, 64 Conn. App. 645–46. In this case, there was no expert testimony that Lerner's alleged negligence was the proximate cause of the plaintiffs'

---

and make sure that the house in this hypothetical got sold.

"[Plaintiffs' Counsel]: Now, what sort of damages would result from their entry into the transaction in that situation?

"[The Witness]: *If it turned out not to be a good idea to own this house,* then the damages would be whatever comes from the fact that they bought the house or accepted title to the house in a situation where they might have otherwise been counseled not to do it. *I have no problem with the fact that the transaction might have turned out to be a good idea.* I don't know from the hypothetical that has been described, *I don't know whether it is a good idea to own the house, whether it turned out to be a benefit or it turned out to be a loss.* But, if it turned out to be a loss, if it turned out to have adverse consequences for the person who took title, then I think those consequences are what flow as damages from the purchase of a property in circumstances where if they were counseled by a lawyer looking out only for them, they might not have purchased it."

\* \* \*

"[Plaintiffs' Counsel]: What type of harm results to the Vonas as a result of that kind of an agreement not being in writing?

"[The Witness]: Under those circumstances, *they would be subjected to a couple of different risks,* the most serious of which would be, if it is, should have been covered by the statute of frauds and is not enforceable because it is not in writing . . . ."

On cross-examination of Hawkins by Lerner's counsel, the following occurred:

"[Defendant Lerner's Counsel]: And do you have any reason to believe based upon your knowledge that had there been full disclosure or what you believe to be full disclosure prior to the signing of this document that Mr. Vona would not have bought 961 North Street? . . .

"[The Witness]: *I have no basis for knowing what Mr. Vona would do or not do under any particular set of circumstances.* . . .

"[Defendant Lerner's Counsel]: By Mr. Lerner having represented both Mr. Vona, Mr. Simms, Mr. Gandolfo, Mrs. Vona at the transaction, did that cause the Vonas any damages?

"[The Witness]: I stated that *it could cause them damage.*

"[Defendant Lerner's Counsel]: Did it cause them damage based on what you know?

"[The Witness]: *I have no idea.*" (Emphasis added.)

claimed damages. Hawkins did not connect the services Lerner rendered with respect to the transfer of the property to any of the financial losses the plaintiffs alleged they sustained after they took title to the property, regardless of their reasons for doing so. The jury therefore could have reached no other conclusion than to find in favor of the defendants.

Furthermore, we agree with the court that the plaintiffs suffered no damages as a result of Lerner's representing them in the transactions regarding the property. He did what the plaintiffs asked of him, i.e., to acquire title to the property for them. At the time of the closing, the property was valued by an independent appraiser as having a fair market value of $2.55 million. The corrected deed indicated that the value given for the property was $2.25 million, the consideration being the $2 million Vona mortgage plus $250,000 of forgiven debts Simms owed Vona and his corporation totaling $2.25 million. The court correctly pointed out that at the time the plaintiffs acquired title to the property, they sustained a $300,000 profit.

To compute damages, if any, the court must value the property at the time it vested in the plaintiffs. See *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 610–11, 724 A.2d 497 (1999); *Tuthill Finance* v. *Greenlaw*, 61 Conn. App. 1, 7, 762 A.2d 494 (2000). The evidence clearly shows that the plaintiffs made a profit when they purchased the property. Once the plaintiffs had title to the property, they alone had authority to decide what to do with it. For all of the forgoing reasons, we conclude that the court properly granted the defendants' motion for a directed verdict.

The judgment is affirmed.

In this opinion the other judges concurred.