Filed 11/13/13  Kirk v. Dimitri CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MARK B. KIRK, | D058758 |
| Plaintiff, Cross-complainant and Appellant, | |
| v. | (Super. Ct. No. 37-2007-00052678-CU-CO-NC) |
| GUIDO DIMITRI, Individually and as Trustee, etc. et al., | |
| Defendants, Cross-complainants and Appellants; | |
| DIMITRI, DIFFENDALE & KIRK, LLC, | |
| Cross-defendant and Appellant; | |
| MARK B. KIRK, INC., | |
| Cross-defendant and Respondent. | |
| MARK B. KIRK, | D059539 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2007-00052678-CU-CO-NC) |

GUIDO DIMITRI, Individually and as Trustee, etc. et al.,

        Defendants, Cross-complainants and Appellants;

DIMITRI, DIFFENDALE & KIRK, LLC,

        Cross-defendant and Appellant.

CONSOLIDATED APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Earl H. Maas, III, Judge. Reversed in part, affirmed in part, and remanded with directions.

Friedhofer PC, James E. Friedhofer; Rowe Allen Mullen and Martin J. Mullen for Plaintiff, Cross-complainant, Cross-defendant and Appellant Mark B. Kirk.

Horvitz & Levy, H. Thomas Watson, S. Thomas Todd; Wayne Thomas & Associates, Timothy D. Lucas; Anderson & Anderson and Steven A. Micheli for Defendants, Cross-complainants and Appellants Guido Dimitri et al.

No appearance for Cross-defendant and Appellant Dimitri, Diffendale & Kirk, LLC.

Steven L. Stern and Deborah L. Zoller for Cross-defendant and Respondent Mark B. Kirk, Inc.

This case arises from a failed real estate venture in Fallbrook, California. The parties appeal the judgment and various court orders following a jury trial on breach of

2

contract and tort claims, a bench trial on equitable claims, and postverdict and postjudgment motions.

## FACTUAL BACKGROUND

Plaintiff and cross-defendant Mark Kirk, owner of licensed general contractor and cross-defendant Mark B. Kirk, Inc. (MBK), met Guido Dimitri and his wife Paula in late 2003. Dimitri owned a lot in Fallbrook and contacted Kirk about building a custom home on his property after seeing one of Kirk's projects in the area. Early in their conversations about building that custom home, they began to discuss the possibility that Dimitri and his son-in-law, George Diffendale, would invest in other residential development projects with Kirk. At the time he met Dimitri, Kirk had development projects under construction with three other investors, including the project Dimitri had seen in Fallbrook.

In December 2003, Kirk entered into a purchase agreement for six neighboring lots, which eventually became known as the Rod Street project. In January 2004, Kirk met with Dimitri and Diffendale to discuss potential development ventures, including the Rod Street project. At this meeting, Dimitri and Diffendale expressed a strong interest in investing with Kirk, and shortly thereafter the men formed Dimitri, Diffendale & Kirk LLC (DDK) for the purpose of developing real property in Fallbrook. Dimitri then loaned DDK $700,000 to finance the purchase and land improvements of four of the six Rod Street lots. Kirk bought one of the remaining two lots individually, and the last was not purchased. In the same time frame, Dimitri purchased another group of four lots in Fallbrook, the Monserate Hill project, to be developed by DDK.

3

DDK contracted with MBK to improve the land and build homes on the four Rod Street lots. Home construction costs were funded by bank loans and the homes ultimately sold in 2005 and 2006 for prices ranging from $950,000 to $1,155,000. DDK repaid Dimitri's initial loan and the bank loans, and the DDK members received fees as provided in the company's operating agreement, but no profits were distributed to its members.

The initial land purchase for the Monserate Hill project by DDK was financed with a $980,238 loan from Dimitri, through his family trust, and another $175,000 loan from Diffendale. The four lots that comprised the project consisted of a 24-acre avocado grove. After the lots were purchased, the DDK members agreed to pursue grading permits to prepare the three smallest of the four lots for development and to begin marketing those lots immediately. With respect to the fourth, larger parcel (totaling 10 acres) the DDK members agreed to subdivide the parcel into four lots. The subdivision required DDK to obtain tentative and final parcel maps from the County of San Diego, which Kirk estimated would take between 19 and 21 months. DDK planned to begin marketing the subdivided lots within the first year after some of the initial development of the property was complete. As with the Rod Street project, DDK contracted with MBK for the construction work on the project. At the outset, the DDK members agreed the properties should be developed and sold as quickly as possible to take advantage of the favorable real estate market.

4

The terms of the initial loans by Dimitri and Diffendale to DDK were set forth in the operating agreement for DDK. The parties also entered into another agreement, the Capital Contribution Agreement (CCA), memorializing a $50,000 capital contribution by Kirk to DDK. In exchange for this contribution, Dimitri and Diffendale explicitly agreed to be "responsible for the total investment capital for the [Monserate Hill] Project, including but not limited to purchase of the land, all improvement costs, and the costs of carrying the [Monserate Hill] Project until the Project is completed and sold." Dimitri and Diffendale further guaranteed "that the development of the [Monserate Hill] project will not be held up for lack of funds" and that "[i]n the event that the [Monserate Hill] project is delayed for lack of funds or any other reason caused by [Dimitri or Diffendale], then [Dimitri and Diffendale] agree[] to pay all related interest charges during the time that the project is delayed and any other losses or damages which may be incurred during the times caused by said delays."

In early 2005, Diffendale's wife (Dimitri's daughter) filed for divorce. This precipitated the buyout of Diffendale's DDK membership interest and the beginning of tensions between Dimitri and Kirk. During the long and hostile buyout negotiation, Kirk became the middleman between the other two DDK members. Over Kirk's disapproval, Dimitri rejected offers on lots from both the Rod Street and Monserate Hill projects to prevent an increase in the value of Diffendale's membership interest in DDK. To force Kirk to go along, Dimitri held the threat of foreclosure and termination of the Monserate Hill project over him. Dimitri rejected an offer of $1,050,000 on one of the Rod Street

5

lots that later sold for $965,000, and two offers on the smaller Monserate Hill lots, one for $800,000 and one for $775,000, which remained unsold at the time of trial. The buyout was finalized by the sale of Diffendale's interest in DDK to Dimitri on December 31, 2005. The parties had agreed DDK would repurchase Diffendale's interest but the deal was modified at the last minute, without Kirk's knowledge, so that Dimitri became the purchaser of the interest.

In addition to financing the project, and against Kirk's recommendation, Dimitri also insisted on managing the avocado grove on the property. Kirk and Diffendale believed DDK would be better served by hiring a professional grove management company. Dimitri, however, predicted the grove would earn revenues of $100,000 per year under his management. To address Kirk's and Diffendale's concerns, Dimitri guaranteed the grove would run at a profit and that he would cover any losses suffered by DDK on the grove. This promise was made explicit in the CCA: "[Dimitri] guarantees that under the grove management of Guido Dimitri that the grove will be profitable after the first year and that fruit sales from the [Monserate Hill] Project will pay the entire costs of operating the grove. Any losses associated with the Grove will be borne by [Dimitri] after the first year." Kirk's fears turned out to be well-founded. He presented expert testimony at trial showing losses on the operation of the grove from 2005 to 2008 of more than $243,000.

After Diffendale's departure from DDK, the relationship between Kirk and Dimitri continued to sour. Kirk took steps to move the project forward to sell the Monserate Hill

6

lots and Dimitri moved to gain control of the Monserate Hill property and end his relationship with Kirk. Other than Dimitri's and Diffendale's initial loans, the development of the Monserate Hill project was financed primarily by bank loans. Over Kirk's objections, however, in 2006 Dimitri paid off the bank loans and became the sole lender for all purposes, through his family trust, gaining more control over DDK. In addition to rejecting viable and profitable offers on various lots, Dimitri managed the avocado grove in a way that harmed DDK's ability to obtain required approvals and a tentative parcel map from the County. Dimitri's work on the grove left the property in disarray, making showing the property to potential buyers difficult. After agreeing to hire engineers to complete the parcel map project in July 2006, in November Dimitri changed course, unilaterally firing them. Around the same time, Dimitri withdrew all remaining funds from DDK's bank account, stalling all progress on the development. Dimitri told Kirk he was forcing Kirk out and he would get nothing.

To continue to move the Monserate Hill project forward and create value in the property, Kirk, without Dimitri's involvement, rehired the engineer and paid fees with his own funds to arrange meetings with the County on the parcel map in the first half of 2007. On June 29, 2007, before the map was approved, Dimitri sent a letter to the County demanding it cease all work. A similar cease and desist letter was sent to Kirk by Dimitri's counsel. All direct communication between Kirk and Dimitri terminated, and the relationship was relegated to their attorneys.

7

In April 2009, the parties authorized the County to restart its work on the subdivision of the 10-acre Monserate Hill lot. The following October the County preliminarily denied a tentative parcel map based on lack of secondary access in the event of a wildfire, and sought a fire protection plan from DDK to remedy the denial. Additional facts are set forth in the opinion where relevant to a particular issue.

PROCEDURAL BACKGROUND

Kirk brought suit individually, and derivatively on behalf of DDK, against Dimitri and Paula. Kirk's complaint included claims for breach of contract, defamation and other intentional torts, negligence, and equitable claims for specific performance and reformation of various notes held by Dimitri. Dimitri countersued Kirk and MBK, individually and derivatively on behalf of DDK, alleging breach of the DDK operating agreement based on allegations that Kirk and MBK overcharged DDK for construction work. Dimitri's cross-complaint also sought declaratory relief and included claims for misrepresentation and breach of fiduciary duty. MBK then countersued DDK for breach of the construction management agreement on the Monserate Hill project.

All the parties' claims, except equitable claims for specific performance and reformation, were tried to a jury beginning on December 14, 2009. Before the close of evidence Dimitri filed a document titled "Memorandum of Points and Authorities in Support of Motion for Directed Verdict on the Cross Complaint of Mark B. Kirk, Inc." The day jury deliberations began, the court heard arguments on this request. At this hearing Dimitri made an additional oral motion for a directed verdict that the CCA was

8

not valid. The court declined to rule on either request, stating its preference to see the jury's verdict first.

The jury returned a unanimous special verdict on liability and nonpunitive damages. The verdict was contained on a series of special verdict forms, one each for Kirk's complaint, Dimitri's cross-complaint, and MBK's cross-complaint. On DDK and Kirk's breach of contract claims, the jury found Dimitri liable and awarded DDK damages of $3,085,000 and Kirk damages of $10,000. The jury also found Dimitri liable for (1) money had and received, awarding $362,000 to DDK; (2) intentional misrepresentation, awarding $243,000 to DDK and $1 to Kirk; (3) conversion, awarding $20,740 to DDK; and (4) breach of fiduciary duty, awarding $1 in damages to both DDK and Kirk. The jury found in favor of MBK, and against DDK, on its breach of contract claim and awarded MBK compensatory damages of $300,000. The jury found for Dimitri on one of his claims, a derivative cause of action for breach of fiduciary duty, and awarded DDK $1 in damages against Kirk. On DDK and Kirk's punitive damages claim, the jury found Dimitri guilty of intentional fraud, oppression or malice, leading to a second trial phase on February 3, 2010. This phase resulted in a unanimous verdict against Dimitri awarding punitive damages of $2.5 million. The jury was discharged after it returned its punitive damages verdict.

During trial, the parties' equitable claims were submitted to the court for decision. After the jury returned its verdict, the court invited briefing on Kirk's equitable claim of reformation. In his posttrial brief Kirk sought equitable reformation of three loans made

9

by Dimitri to DDK to reduce the interest rates to conform to the original agreement of the parties. Kirk also requested a ruling on his claim for specific performance of Dimitri's obligation to continue to fund the development of the Monserate Hill project. Dimitri sought a judicial declaration terminating his obligation to fund the project. Dimitri's posttrial brief also raised his claim of setoff (or offset), set forth as an affirmative defense in his answer to Kirk's complaint, seeking reduction of any award against him by the amount of principal and interest owed to him by DDK. Dimitri's brief did not identify a specific amount of offset, but stated Dimitri would "identify those obligations owed to him which he will choose to offset against the judgment."

In addition to addressing these equitable issues, Dimitri also asked the court to modify the jury's verdicts in a number of respects, labeling these requests "motions for directed verdict." Dimitri renewed his request for a directed verdict on MBK's breach of contract claim, asking the court to overturn the jury's verdict on this claim. Dimitri also asked the court to overturn the jury's verdict on DDK's intentional misrepresentation claim, to "correct" the damages awarded to DDK for Kirk's money had and received claim, and to eliminate or reduce the jury's punitive damages award.

On May 10, 2010, the court issued a "Ruling and Verdict on Issues Submitted to the Court," finding for Dimitri on his claim for declaratory relief to discontinue his funding obligation to DDK on the Monserate Hill project and against Kirk's request for specific performance. The court also ruled against Kirk on his request for reformation of the various notes. With respect to Dimitri's request for offset, the court "allow[ed] the

10

requested offset against the judgment for amounts due under the pending notes," and ordered the parties to calculate the amount and include "such findings in the judgment."

Over Kirk's procedural objections, the court also ruled on Dimitri's directed verdict motions. Recognizing a procedural problem, the court stated it would rule on the posttrial motions, despite being "potentially premature," to "avoid duplicity of hearings."[1] The order denied Dimitri's motion for directed verdict on the contract award in favor of MBK, Inc., granted Dimitri's request to reduce the verdict on the " 'money paid/had' cause of action to $95,607.72," struck the jury's damages award on Kirk's intentional misrepresentation claim, and reduced the punitive damages award to $100,000. The order also directed Kirk to prepare a judgment and submit it to the court within 20 days.

Kirk unsuccessfully moved the court to reconsider its ruling on Dimitri's directed verdict motions on the ground that the order constituted an "unforeseeable *de facto* grant of a Motion for New Trial and/or Motion for [Judgment Notwithstanding The Verdict (JNOV)] . . . ." Thereafter, the parties submitted competing judgments and supporting briefs seeking a ruling from the court on the disputed issue of the amount of offset. Kirk

---

[1]	The procedural problem with Dimitri's motion was also recognized by the court at the April 30, 2010, hearing on the equitable claims, at least with respect to the request to reduce the punitive damages award. The court stated: "I'm willing to make a decision on [punitive damages] now, but I don't want to make a decision on that if either party's going to stand on, 'well, wasn't the right time, had to be done later.' [¶] I do think probably technically [Kirk is] correct, that it should be something that's done [postjudgment], but the court has spent all the time with your file, so my preference would be to do it whenever I'm going to do it now or when I finish this." The court then sought (and received) Kirk's consent to rule on Dimitri's request to eliminate or reduce the punitive damages award.

11

argued no offset was warranted because there had been no adjudication by the jury or court as to the amount owed by DDK to Dimitri. Kirk also pointed to specific elements of Dimitri's claimed offset that he believed should be deducted, including a $225,000 loan related to the Diffendale buyout, a $20,000 note related to grove management fees, and portions of the amount of accrued interest on all the other notes.

On September 1, 2010, the court notified the parties by letter that it would accept Dimitri's proposed judgment, with the modifications that interest on the offsetting notes should be calculated through May 10, 2010 (not the date of the entry of judgment as proposed by Dimitri), and the offset should not include the note related to grove management fees. Dimitri submitted a revised judgment entered by the court on September 16, 2010. Both parties subsequently filed motions for JNOV and new trial, and Dimitri also filed a motion to amend the judgment. These motions were denied.

In October 2010, Kirk filed a motion seeking attorney fees as the prevailing party on his breach of contract claims under Civil Code section 1717 and the attorney fee provision in the DDK operating agreement. After briefing, the court issued a minute order requiring Kirk "to provide additional information apportioning [attorney] fees between the contract and tort causes of action and between Kirk and DD&K." Both parties filed briefs on the allocation of fees and the Dimitris each filed motions seeking attorney fees under section 1717 and under the prevailing party fee provision in various notes between their family trust and DDK.

12

Oral argument on the fee motions took place on January 13, 2011. On January 27, 2011, the court issued a "Ruling Regarding Attorney[] Fees" subsequently modified to award: (1) Dimitri $120,000 against Kirk and DDK, jointly and severally; (2) $120,000 to Paula against Kirk; (3) $350,000 to Kirk against DDK; and (4) $108,541.55 to MBK against DDK. The parties appealed the judgment (and postverdict orders for directed verdict) and later the court's order awarding attorney fees. We consolidated the appeals on our own motion for review.

DISCUSSION

Kirk's appeal challenges the trial court's rulings on Dimitri's request for a directed verdict modifying the jury's verdict before the entry of judgment, the court's rulings on the parties' equitable claims, and various aspects of the court's attorney fee award. Kirk challenges the directed verdict rulings on both procedural and substantive grounds. Dimitri appeals the judgment against him on Kirk's breach of contract claims, MBK's breach of contract claim, DDK's claim for money had and received, DDK's conversion claim, and one aspect of the court's attorney fee award.

I

DIMITRI'S POSTVERDICT REQUESTS FOR DIRECTED VERDICT

Kirk contends the timing of the trial court's ruling on Dimitri's request for a directed verdict, after the issues were decided by the jury and the jury was discharged, mandates reversal. He argues a directed verdict may not be granted after the jury has been discharged except in the limited circumstance, not applicable here, in which the jury

13

has not yet rendered a verdict.  Kirk further contends the court's rulings were defective because Dimitri's requests for directed verdict lacked merit.  We conclude the trial court erred by granting Dimitri's motion for directed verdict on both procedural and substantive grounds.

A. Procedural Error

The Code of Civil Procedure sets forth three mechanisms for seeking a ruling on the legal sufficiency of the evidence proffered or presented by the opposing party at various times during trial.  First, the defendant may move for nonsuit after the plaintiff's opening statement or at the close of the plaintiff's evidence.  (Code Civ. Proc., § 581c, subd. (a).)  Second, any party may move for a directed verdict after all parties have completed their presentation of evidence.  (Code of Civ. Proc., § 630.)[2]  Third, a party, or the court on its own motion, may move for JNOV after judgment or after a verdict has been rendered, but before judgment has been entered on the verdict.  (§§ 629, 659.)

The function of all three of "these motions is to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict."  (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.)  Each motion may be granted " 'only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' "  (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770, quoting *Sweatman*

_____

[2]     All further statutory references are to the Code of Civil Procedure unless otherwise specified.

14

*v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) We review the trial court's ruling on each of these motions by applying that same standard. (*Fountain Valley*, at p. 750.)

Dimitri's motion for directed verdict *after* the verdict was rendered and the jury had been dismissed was procedurally unsound. Although not explicitly mandated by the directed verdict statute (§ 630), directed verdict motions are typically made after the presentation of evidence is complete and before the verdict is rendered. (See *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs*, *supra*, 67 Cal.App.4th 743.) Section 630 provides an exception permitting the court to order judgment in favor of a party after the jury is discharged only when the jury is discharged without rendering a verdict. (§ 630, subd. (f).) This exception and the JNOV procedure set forth in section 629 are meaningless if a party can bring a motion for directed verdict after the jury has rendered its verdict. (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1030 ["We . . . generally avoid a reading that renders any part of a statute superfluous."].)

Additionally, unlike a JNOV motion, a party opposing a motion for directed verdict is afforded the opportunity to seek leave to reopen evidence to remedy any defect raised by the moving party. (*Sanchez v. Bay General Hosp.* (1981) 116 Cal.App.3d 776, 793.) To the extent Dimitri's directed verdict motion had merit, Kirk should have been afforded his right to petition the court to reopen the trial to present any additional evidence that supported his claims. The procedure used in this case foreclosed Kirk from exercising this right. The court erred by ruling on Dimitri's directed verdict motion after

15

the jury rendered its verdict. To treat Dimitri's directed verdict requests as a motion for JNOV on its own motion, the court was required to provide the parties with five days' written notice. (*Webb v. Special Electric Company, Inc.*, 214 Cal.App.4th at p. 609.) The trial court here did not provide notice of an intention to grant the JNOV motion and, therefore, lacked the statutory authority to do so. (*Ibid*.)

B. <u>Dimitri's Requests for Directed Verdict</u>

Disregarding the court's procedural error, the portions of the order granting Dimitri's posttrial motions for directed verdict cannot be upheld. A motion for directed verdict is in the nature of a demurrer to the evidence. (*Estate of Lances* (1932) 216 Cal. 397, 400-401; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629.) "In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. It may not grant a directed verdict where there is *any* substantial conflict in the evidence. [Citation.] A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party." (*Howard*, at pp. 629-630.)

We review the court's grant of a directed verdict de novo, " 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.'

16

[Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to [the] plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541.)

Applying these standards, a directed verdict was properly granted only if the evidence was insufficient to support a verdict in Kirk's favor. (*Estate of Lances*, *supra*, 216 Cal. at p. 400; *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 ["The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict."].)

1. *Intentional Misrepresentation*

Dimitri argued in his motion for directed verdict the $243,000 award in favor of DDK for intentional misrepresentation should be stricken because Kirk did not bring this claim derivatively on behalf of DDK and because, as a member of DDK, it was impossible for Dimitri to make a misrepresentation to himself. The court ruled "[t]he 2nd Amended Complaint states a cause of action on behalf of Kirk, only. Further, as both the alleged 'misrepresenter' and a manager of DD&K, this finding would require Dimitri to intentionally misrepresent something to himself."

Kirk challenged this ruling in unsuccessful motions for JNOV and new trial. At the hearing on these posttrial motions, the court explicitly acknowledged there was sufficient evidence to support the jury's $243,000 award for intentional misrepresentation

17

and that its ruling striking those damages may have been wrong. Unsurprisingly, Kirk appeals, arguing sufficient evidence supported the jury's verdict. In response, Dimitri abandons the arguments he made in the trial court that the derivative nature of the claim was not adequately pleaded and, as a member of DDK, Dimitri could not be held liable to DDK for intentional misrepresentation. Instead, Dimitri contends the evidence was insufficient to find him liable for intentional misrepresentation or, alternatively, the evidence only supported an award of $34,888.

At trial, Kirk's expert on the profitability of the grove testified the grove had a cumulative loss of $243,108 from 2005 to 2008, substantially matching the jury's award of $243,000 on Kirk's claim for intentional misrepresentation. Consequently, the parties presume the jury's verdict for intentional misrepresentation was based on Dimitri's promise he would reimburse DDK for any losses it suffered as a result of his management of the avocado grove.

Actionable fraudulent misrepresentation based on a promise requires evidence of the promisor's intent not to perform on the promise at the time it was made. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) Dimitri contends his promise cannot support the jury's verdict because Kirk did not show Dimitri did not intend to run the grove profitably. However, the question here is not, as Dimitri poses, whether Dimitri intended to run the grove profitably. Instead, the appropriate question is whether Dimitri intended to cover the losses, as he promised, if the grove was not profitable. As the trial

18

court noted, there was sufficient evidence from which the jury could infer Dimitri never intended to reimburse DDK for losses on the management of the avocado grove.

Dimitri's adamant denial during trial of ever making the promise was strong circumstantial evidence that his intent at the time he made the promise was not to honor it. (See *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [noting fraudulent intent can be shown by defendant's "hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform"].) After the jury found the promise was made, it could infer from Dimitri's denials that he did not intend to cover the losses.

Dimitri also contends his promise "of 'profitability' was too vague, as a matter of law, to support the intentional misrepresentation verdict." As noted, the promise forming the basis of Kirk's claim (on behalf of DDK) was not that the grove would be profitable, but that Dimitri would reimburse DDK for any losses it sustained while Dimitri managed it. To support a claim for promissory fraud, the promise must " 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' " (*Bustamonte v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 209.) Dimitri's promise to cover losses on the grove met this threshold.

Sufficient evidence also supported the amount of damages for intentional misrepresentation awarded by the jury. Dimitri claims there was no evidence to support measuring profitability of the grove on an annual basis. The CCA, however, referred to profitability "after the first year," the construction management agreement between DDK

19

and MBK referred to yearly periods, and Dimitri himself estimated the grove would provide profits of $100,000 a year. As to the amount of damages, Kirk testified he estimated the grove sustained losses of between $250,000 and $300,000 and his expert showed losses of $243,108. The jury was free to accept these figures and reject Dimitri's expert's conflicting testimony that the grove did not sustain any losses. (See *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 623 [when " 'the evidence gives rise to conflicting reasonable inferences, one of which supports the findings of the trial court, the trial court's finding is conclusive on appeal' "].) We reverse the judgment on this claim and reinstate the jury's verdict for Dimitri's intentional misrepresentation of $243,000 in favor of DDK and $1 in favor of Kirk.

2. *Money Had and Received*

In addition to the improper timing of Dimitri's directed verdict motion, the court's reduction of the damages awarded to Kirk on behalf of DDK on his claim of money had and received was procedurally defective for another reason. "The Legislature has provided an exclusive remedy for a trial court to employ where some damages are properly awarded, but the amount is excessive. That is through a remittitur pursuant to Code of Civil Procedure section 662.5." (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1604-1605, fn. omitted.) "[T]he legislative system as enacted makes it plain that damages, except those which may be determined as a matter of law, are to be fixed by the trier of fact and, if erroneous in amount, subject to the reduction or new trial procedure specified in" section 662.5, subdivision (a)(2). (*Teitel,* at p. 1605.) By ruling

20

on Dimitri's "directed verdict" motion to reduce the amount of damages awarded, the court improperly bypassed the remittitur procedure. However, the procedure followed by the appellate court in *Teitel*--reversing the order granting JNOV and remanding with directions to reconsider the new trial motion simultaneously filed with defendant's motion for JNOV--is not available in this case. (*Id.* at pp. 1606-1607.) Because the court reduced damages on the directed verdict motion, Dimitri did not file either a motion for JNOV or new trial motion on this issue.

Dimitri argued the jury's award on Kirk's claim for money had and received was excessive because the only claim in the operative complaint that could be considered a claim for money had and received was its 23d cause of action, titled "Money Paid by Mark Kirk against Guido Dimitri." The claim sought the return of $95,000 mistakenly paid to Dimitri. In response to Dimitri's motion, Kirk argued the amount of the award above $95,000 was supported by evidence of excessive interest Dimitri charged DDK over the years "based upon the financial leverage and undue influence [Dimitri] possessed over" DDK. The evidence included Kirk's testimony DDK paid Dimitri more interest, or owed more accrued interest, than the amount agreed to by the parties on certain loans. Kirk's expert calculated this excessive interest to be approximately $268,000.

Kirk makes the same argument here, adding that in addition to the excessive interest, evidence of other damages DDK suffered as a result of Dimitri's fraud and exercise of undue influence supported the jury's award. Dimitri contends the reduction

21

should be upheld because the excessive interest had not been paid at the time of trial, but instead was awarded to him as an offset after the fact. Further, Dimitri argues the cause of action for "Money Paid" in Kirk's complaint limited the available damages to $95,000.

" '[A]n action for money had and received will lie to recover money paid by mistake, under duress, oppression, or where an undue advantage was taken of plaintiffs' situation whereby money was exacted to which the defendant had no legal right.' " (*J. C. Peacock, Inc. v. Hasko* (1961) 196 Cal.App.2d 353, 361.) "However, 'no recovery for money had and received can be had against a defendant who never received any part of the money or equivalent thing sued for. [Citation.]' " (*First Interstate Bank v. State of California* (1987) 197 Cal.App.3d 627, 635.) We agree with Kirk there was sufficient evidence presented at trial to support the jury's award of $362,000. The evidence included both the check for $95,607.72 that was the subject of the "Money Paid" cause of action, and evidence Dimitri charged DDK excessive interest, a portion of which had been paid to Dimitri at the time of trial.

We are not persuaded by Dimitri's contention the excessive interest could not be awarded to Kirk because DDK "never actually paid any of this supposedly excessive interest to Dimitri." He relies on *Rotea v. Izuel* (1939) 14 Cal.2d 605 and *Rains v. Arnett* (1961) 189 Cal.App.2d 337 to argue recovery for money had and received "is denied in such cases unless the defendant himself has actually received the money." (*Rotea,* at p. 611.) *Rotea* and *Rains* involved payments by plaintiffs to third parties, not the defendants. Both courts held a claim for money had and received could not be upheld

22

when the defendant had no obligation to pay back the money to the plaintiff. (*Rotea*, at pp. 611-612 [payment of medical expenses for decedent's sister]; *Rains*, at p. 344 [payments by plaintiff lessee to third party for repairs on defendant lessor's equipment].) In a third case cited by Dimitri, *First Interstate Bank v. State of California, supra,* 197 Cal.App.3d 627, the court similarly denied a claim for money had and received where the defendant was not a party to the contract sued on and there was no allegation defendant had any "right, claim or interest in or to" the disputed sum. (*Id*. at p. 635.)

Here, a portion of the excessive interest, $23,145, was paid to Dimitri. With respect to the interest accrued, unlike *Rotea*, *Rains* and *First Interstate,* in which the plaintiff paid money to a third party and not the defendant, Dimitri had a *contractual right* to the interest Kirk claimed was excessive. This right was confirmed by the court's ruling on Dimitri's request for equitable offset, which accelerated the notes and awarded Dimitri the amounts owed under those notes, including the $245,046 in accrued interest the jury awarded on the claim for money had and received.[3]

Dimitri's argument that the allegations contained in Kirk's complaint bar the entry of judgment for the total jury award is also not persuasive. Although the amount of damages stated in a demand limits the damages recoverable on a default judgment, the amount requested does not limit the amount recoverable at trial. (§ 580.) In a contested

---

[3]     As we will discuss, however, we are remanding the trial court's offset ruling with directions to reexamine the amount of interest allowed as an offset considering the jury's factual findings. If the trial court determines on remand Dimitri is not entitled to offset the $245,046 awarded by the jury to DDK on the money had and received claim, he would no longer have a contractual right to the interest. In that event, we direct the trial court to reduce the award for this claim by $245,046.

action the court may grant a plaintiff any relief "consistent with the case made by the complaint and embraced within the issue." (*Ibid*.) "Under general rules of pleading and practice, the plaintiff is not limited to the damages specified in his complaint when he proceeds to trial." (*Damele v. Mack Trucks, Inc.* (1990) 219 Cal.App.3d 29, 38.) "[T]he 'well settled' rule is that a plaintiff may secure relief different from or greater than that demanded in the complaint." (*Id*. at p. 39.) In addition, although not controlling in a noncontested action, Kirk's prayer seeks "such other and further relief as this court deems just and proper."

Here, the amount of damages awarded by the jury on the money had and received claim was consistent with evidence presented at trial concerning Dimitri's ability to charge excessive interest through his misconduct. Although the award exceeded the $95,000 set forth in the specific claim for "Money Had," it was not inconsistent with the issues set forth in the complaint or the evidence admitted at trial. "The parties thus actually tried the issues of damages in amounts above the limits set forth in" Kirk's 23d cause of action. (*Castaic Clay Manufacturing Co. v. Dedes* (1987) 195 Cal.App.3d 444, 450.) The jury's verdict on the claim of money had and received could not have come as a surprise to Dimitri "and was the source of no prejudice to him since no additional time or effort by him was required to meet those issues." (*Ibid*.)

Dimitri cites *Wozniak v. Lucutz* (2002) 102 Cal.App.4th 1031 for the proposition that " 'in the absence of an amendment to the complaint to conform to proof, a court may not award the plaintiff a sum in excess of the amount of damages he claims to have

24

sustained.' " (*Id*. at p. 1044.) *Wozniak*, however, concerned the limitation of damages in a limited civil case in which the jury returned a verdict that exceeded the jurisdictional limit of $25,000. (*Id*. at p. 1036.) The plaintiff in *Wozniak* brought his claim in the former municipal court in Los Angeles County. During the pendency of the case, before the defendant answered, the trial courts in the county were unified and the case maintained its status as a limited civil case. The court found the plaintiff, who filed suit in the (former) municipal court, could not have expected damages on his claim exceeding the jurisdictional maximum and that absent a " 'specific enumerated demand for an amount in excess of [that amount], his pleadings should be construed as seeking the relief . . . it is within the jurisdiction of the court to give.' " (*Id*. at p. 1044.) Contrasting the case before it to a situation like that presented here, the court held an "award of damages in an amount greater than set forth in the complaint nevertheless has been affirmed [where] the parties had voluntarily submitted and actually tried the issue and there was no prejudice or surprise to the defendant." (*Id*. at p. 1045.)

In addition, the money had and received section of the special verdict form prepared by the parties bore no specific relationship to the facts alleged under the 23d cause of action. The form asked jurors: "Did GUIDO DIMITRI obtain money or property from DIMITRI, DIFFENDALE &KIRK LLC by fraud or the exercise of undue influence?" The jury answered "yes," leading to the next question: "Do you find that in fairness that GUIDO DIMITRI is obligated to pay to DIMITRI, DIFFENDALE & KIRK LLC, money that was obtained improperly?" Again, the jury responded "yes," leading to

25

the final question: "What is the amount of money which in fairness should be paid to DIMITRI, DIFFENDALE & KIRK LLC by GUIDO DIMITRI?" The jury returned a unanimous answer of $362,000.

Nothing in the special verdict form connected the claim of money had and received to the specific issue of the $95,000 payment to Dimitri outlined in the "Money Paid" cause of action. Instead, the jury was asked to make a general finding concerning money or property obtained by Dimitri from DDK by fraud or the exercise of undue influence. This explanation of what the claim required certainly could include the excessive interest Kirk showed Dimitri charged as a result of his "undue influence." Had Dimitri believed the claim for money had and received was limited in the way he now argues, the error was invited by the manner in which the claim was presented to the jury. (See *In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 ["an appellant waives his right to attack error by expressly or implicitly agreeing or acquiescing at trial to the ruling or procedure objected to on appeal."].) We conclude the court's reduction of the verdict on the claim of money had and received was error and reverse that reduction.

3. *Punitive Damages Award*

Because we determine the jury's verdict on Kirk's claim for intentional misrepresentation must be reinstated, we also conclude the jury's award of punitive damages was within constitutional boundaries.

In the second phase of the trial, the jury awarded DDK punitive damages of $2.5 million. Dimitri then brought his postverdict, prejudgment motion for "Directed Verdict

26

On The Punitive Damage Award." Dimitri argued the punitive damages award was unconstitutional because of the low degree of reprehensibility of his conduct. Kirk countered that Dimitri's motion was premature and, in any event, the award, representing a ratio of 9.5 to 1 between punitive and compensatory damages, was not outside the constitutional boundary.

After eliminating the intentional misrepresentation damages entirely, the court reduced the punitive damages award to $100,000, finding "the jury's award was not supported by the evidence, and that the amount was inconsistent with both California's and Federal cases regarding the size of the award." The court went on to state it had "considered the degree of reprehensibility of Dimitri's misconduct, the disparity of the actual harm suffered and the punitive damage award, the fact that the actual damages awarded are significant, the fact that the parties are all 'sophisticated businessmen,' and the fact that the actions taken were primarily financial in nature, as opposed to physical. The [c]ourt further considered all of the evidence admitted during trial and [found a $100,000 award] to be appropriate in light of those considerations."

On appeal, Kirk argues that if the damages for intentional misrepresentation are reinstated, the jury's punitive damages verdict is within constitutional limits and should also be reinstated. Dimitri responds that just $3,000 of the jury's compensatory damages award can be appropriately considered as a basis for the punitive damages award.[4]

_____

[4]     In addition to contending the court's elimination of damages on Kirk's claim for intentional misrepresentation was proper, Dimitri argues in his appeal that sufficient

27

Therefore, the trial court's reduction of the jury's punitive damages award to $100,000, equaling a ratio of punitive to compensatory damages of 13.33 to 1, is the constitutional maximum this court may uphold.

We determine de novo whether an award of punitive damages is unconstitutionally excessive and make an independent assessment of (1) the reprehensibility of the defendant's conduct, (2) the relationship between the punitive and compensatory damages, and (3) any civil penalties for comparable conduct.  (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172.)  However, we defer to any findings of historical fact made by the trial court that are supported by substantial evidence.  (*Ibid.*)  In reviewing the constitutionality of a punitive damages award, we determine only the constitutionally permissible maximum amount.  (*Id.* at p. 1188.)  We do not decide what particular amount we believe should have been awarded on the facts and circumstances of the case.  (*Ibid.*)

The parties focus their arguments primarily on the relationship between compensatory and punitive damages.  A necessary starting point is a determination of the amount of compensatory tort damages at issue.  Because we reinstate the jury's $243,000 verdict on the claim for intentional misrepresentation and reject Dimitri's contention that only $3,000 of the $20,740 award for conversion is supported by the evidence, we conclude the harm to DDK is the jury's full award of compensatory damages on these tort claims, $263,740.

---

evidence supported only $3,000 of the jury's award of $20,740 on Kirk's claim for conversion.

There is no " ' "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" ' " ratio. (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 583.) Instead, " ' "[a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus." ' " (*Ibid*.) "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 425.) As noted, Dimitri presumes only $3,000 of the compensatory tort damages will be upheld and states the resulting ratio of 13.33 to 1 is the constitutional maximum. Because we reinstate the intentional misrepresentation damages and affirm the conversion damages, the jury's award of compensatory and punitive damages results in a ratio of 9.48 to 1 ($2.5 million to $263,740). This ratio is within the constitutional maximum conceded by Dimitri.

Further, the degree of reprehensibility of Dimitri's conduct as it related to Kirk's fraud and conversion claims supported the jury's award. Dimitri's conduct did not involve physical harm or an indifference to the health and safety of others, but it did evince the other factors justifying an award of punitive damages. (See *State Farm Mut. Auto. Ins. Co. v. Campbell, supra,* 538 U.S. at p. 419 ["We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the

harm was the result of intentional malice, trickery, or deceit, or mere accident."].)

Dimitri used DDK's financial vulnerability to coerce oppressive financial agreements and to try to push Kirk out of the business. (*Ibid.*) Dimitri's conduct also "involved repeated actions," including repeatedly falsely assuring Kirk he would reimburse DDK for losses caused by his management of the avocado grove, diverting proceeds from the grove, using company assets and equipment for his personal benefit, and coercing kickbacks from field workers paid by DDK. (*Ibid.*) The harm caused by Dimitri was not accidental, but was "the result of intentional . . . deceit." (*Ibid.*) For these reasons we reverse the judgment and reinstate the punitive damages awarded by the jury.

II

EQUITABLE ISSUES TRIED BY THE COURT

A. Offset

The court allowed the parties to file briefing on the equitable issues that remained for the court's consideration after the jury returned its verdict. In his brief, Dimitri asked the court to allow him to offset the judgment that ultimately would be entered with the amounts owed to Dimitri by DDK under various notes. Kirk responded no offset should be allowed because Dimitri failed to carry his burden to establish the affirmative defense of offset. The court ruled it would "allow[] the requested offset against the judgment for amounts due under the pending notes" and instructed the parties to calculate the offset and include "such findings in the judgment."

30

The parties then contested the amount of the offset by the submission of competing judgments and supporting briefs. Dimitri's version applied offsets of $3,301,348.72, consisting of interest and principal on various notes related to the Monserate Hill Project and $225,000 Dimitri loaned DDK to buy out Diffendale. Kirk argued in response "no offset should be applied against the jury's verdict" because there had "been no actual adjudication regarding the alleged amounts owing by [DDK] to Dimitri . . . ." Kirk's proposed judgment included an offset, but called for lower amounts of interest to satisfy the notes and excluded offsets for the loan related to the Diffendale buyout and another loan related to Dimitri's grove management fee.

In response to the parties' request for the court to determine the amount of offset, the court issued a letter stating it primarily agreed with Dimitri's version of the judgment, but set the date for calculating the interest to the date of its prior ruling (not the date of entry of judgment as proposed by Dimitri) and eliminated the offset for the loan related to the grove management fee. The letter instructed Dimitri to prepare and submit a revised judgment, which the court signed and entered on September 16, 2010. On appeal, Kirk argues the court-awarded offset was contrary to the jury's verdict and the offset of $225,000 related to the Diffendale buyout was not supported by the evidence.

The right to an equitable offset is founded on the "principle that 'either party to a transaction involving mutual debts and credits can strike a balance, holding himself owing or entitled only to the net difference . . . .' " (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744.) " '[I]t is well settled that a court of equity will compel a[n

31

offset] when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered.' " (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 762.) The issue of offset was properly raised by way of Dimitri's answer and request for an offset after the jury rendered its verdict. (See *id.* at pp. 762-763.)

"Consistent with the general rule imposing on a party the burden of proving the existence or nonexistence of each fact essential to a claim or defense (Evid. Code, § 500), '[a] defendant seeking an offset against a money judgment has the burden of proving the offset. [Citation.]' " (*Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1077, disapproved on other grounds in *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 382.) "Whether [an offset] is appropriate in equity is a question within the trial court's discretion. We review the court's decision under the abuse of discretion standard. [Citation.] An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 762-763.)

Further, the court's ruling on Dimitri's equitable offset defense is limited by the jury's factual findings. (See *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 157 ["a jury's determination of legal issues may curtail or foreclose equitable issues"] (*Hoopes*).) "Where legal claims are first tried by a jury and equitable claims later tried by a judge, the trial court must follow the jury's factual determinations on common issues of fact."

32

(*Id*. at p. 158.) The trial court was entitled to make factual determinations of its own concerning Dimitri's offset defense only to the extent that "[n]othing in the jury's verdict resolve[d] the factual matter presented by the defense of" equitable offset. (*Id*. at p. 162.)

Like collateral estoppel, issues decided by the first finder of fact (here the jury) " 'become "conclusive on issues actually litigated between the parties." ' " (*Hoopes*, *supra*, 168 Cal.App.4th at p. 158.) "While the comparison to collateral estoppel is inexact [citation], there are solid policy reasons for giving one fact finder's determinations binding effect in a mixed trial of legal and equitable issues. The rule minimizes inconsistencies, and avoids giving one side two bites of the apple. [Citation.] The rule also prevents duplication of effort." (*Ibid*.)

The offset awarded by the court can be broken into three parts for purposes of our analysis: the principal portions of the various Monserate Hill project notes; the interest portions of those notes; and the $225,000 loan related to the Diffendale buyout. With respect to the notes' principal, Kirk argues the doctrine of unclean hands precluded the court from finding this obligation could be offset against the judgment. Kirk does not claim DDK did not owe these amounts, but contends the factual findings of the jury precluded the court from finding the doctrine inapplicable. The specific determinations of the jury he points to, however, do not concern the principal of the notes but relate only to the amount of interest owed. Thus, the court did not abuse its discretion by finding the doctrine of unclean hands inapplicable to the principal portion of the notes. (See *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 ["The decision of

33

whether to apply the [doctrine of unclean hands] based on the facts is a matter within the trial court's discretion."].)

With respect to the interest portion of the notes, Kirk argues factual findings that preclude Dimitri from recovering all of the interest on the notes were implicit in the jury's verdict on his intentional misrepresentation and breach of contract claims. Kirk points to two such findings. First, he contends the jury implicitly found the CCA was enforceable by its verdict on Kirk's claim for intentional misrepresentation. He argues the jury must have found the CCA was enforceable because Dimitri's promise to pay grove losses was set forth in that agreement. Second, Kirk argues the verdict for breach of contract was based on the jury's factual finding that Dimitri's delay was a breach of his contractual obligations under the DDK operating agreement. In Kirk's view, because the jury found the CCA to be enforceable, the court was required to consider whether Dimitri's delay also breached the CCA and triggered his promise "to pay all related interest charges during the time that the project is delayed." Further, because the jury found the project would have been completed earlier had Dimitri not caused delay, the notes would have been paid off earlier, resulting in less interest owed.

Dimitri responds that the jury's intentional misrepresentation verdict did not require a finding the CCA was enforceable because oral promises he made to Kirk and Diffendale to reimburse DDK for grove losses independently supported the verdict. The record, however, does not support this argument. The trial testimony Dimitri points to underscores the CCA's written agreement to insure DDK against grove losses. It does not

34

evidence separate oral promises that would support the jury's intentional misrepresentation verdict absent the CCA. Dimitri concedes the jury found his actions delaying the project breached the DDK operating agreement, and does not address the impact of that finding on the court's offset award.

We agree with Kirk these factual findings were contrary to the court's allowance of offset for all interest owed from the inception of each note to the date of the court's ruling on equitable claims. The jury found Dimitri breached the operating agreement by his delay and the CCA was enforceable; the trial court was bound by these findings. (*Hoopes*, *supra*, 168 Cal.App.4th at p. 161.) Under the CCA, Dimitri was obligated to pay interest on DDK's loans if he breached his contractual obligation not to delay finalization of the project. To allow this interest as offset, then, the court needed to find either this provision of the CCA was not enforceable or Dimitri's delay was not a breach of the agreement.[5] Either factual determination improperly contradicted the jury's findings and was error. (See *Hoopes, supra,* 168 Cal.App.4th at p. 161 ["The trial court erred in disregarding the jury's verdict when fashioning equitable relief founded on the same evidence and same operative facts as the verdict."].) The issue is remanded and the

---

[5] It does not appear the court considered these factual issues. Instead, it asked the parties to determine the appropriate amount of interest that could be offset against the jury's damages award. When the parties--unsurprisingly--could not agree, the court accepted Dimitri's calculation.

trial court is directed to determine what amount of interest Dimitri may collect as offset considering these factual findings.[6]

Kirk argues there was no substantial evidence to support offset of the loan related to the Diffendale buyout. Unlike the offset for the other notes, however, he points to no jury finding that foreclosed the court from making its own finding as to whether this amount was owed to Dimitri. The parties introduced conflicting evidence on whether Dimitri was owed $225,000 as a result of the buyout. Kirk points to what he characterizes as admissions by Dimitri and his attorney that Dimitri was not owed this amount.

Other testimony and the documentation of the transaction presented at trial, however, showed Dimitri was owed these funds. Specifically, Dimitri returned $225,000 in payments DDK made to him on certain notes after the Rod Street project sales were finalized so DDK could make a required profit distribution to Diffendale to finalize the buyout. This resulted in DDK owing Dimitri $225,000 in addition to Dimitri's assumption of Diffendale's loans to DDK (the consideration for Dimitri's purchase of Diffendale's interest). This evidence supported allowing $225,000 as offset and this portion of the ruling was not an abuse of discretion.

---

[6]    As set forth in footnote 3 and in our disposition, to the extent the court determines on remand Dimitri is not entitled to an offset of the amount of accrued excessive interest the jury awarded on Kirk's claim for money had and received ($245,046), the trial court is directed to reduce the damages awarded on the claim for money had and received by that amount. This calculation will not affect the $95,607.72 that related to the separate payment to Dimitri or the amount of excessive interest paid by DDK at the time of trial ($23,145) awarded to DDK on the money had and received claim.

B. Specific Performance

Kirk's final contention on appeal is that the trial court erred by finding Dimitri was not required to continue funding the Monserate Hill project. In its ruling on this issue, the court noted, "[w]hile the parties have not included a cause of action for dissolution, there is no reasonable belief that further interaction between the parties would result in anything other than further litigation. Plaintiff and Cross[-c]omplainant have received an award of damages in this action, and an affirmative injunction would be duplicative and punitive."

"To obtain specific performance after a breach of contract, a plaintiff must generally show: '(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract. [Citations.]' [Citations.] A grant or denial of specific performance is reviewed under an abuse of discretion standard." (*Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472.)

Dimitri's argument that Kirk did not show the inadequacy of DDK's legal remedy is well taken. The jury found Dimitri breached his contractual obligations by delaying the development of the Monserate Hill Project. For this breach the jury awarded DDK damages of $3,085,000, the amount of profit Kirk contended DDK would have earned but for Dimitri's breach. Under this damage theory, the contract was effectively

37

terminated. DDK could not both obtain the profits it would have received by selling the properties, and require Dimitri to continue financing to obtain a later round of profits on the eventual sale of the lots. (See *Paularena v. Superior Court* (1965) 231 Cal.App.2d 906, 915 ["Damages may not be recovered on the theory that the contract exists and additionally on the theory that the contract is at an end."]) As the trial court noted, such an injunction would be "duplicative and punitive." (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 905 ["a party may not obtain both specific performance and damages for the same breach of contract, either in single or multiple actions."] Likewise, the court's denial of Kirk's request for specific performance was not an impairment of his contractual rights. Kirk enforced his contractual rights and obtained a damages award for profits he would have received had the contract been fully performed.

III

DIMITRI'S APPEAL

Dimitri raises four issues on appeal: (1) whether the damages awarded to DDK for Dimitri's breach of contract should be reversed because they were not reasonably foreseeable; (2) whether MBK failed to prove it was a licensed contractor, necessitating reversal of its breach of contract claim; (3) whether sufficient evidence supported the portion of damages not reduced by the trial court on Kirk's claim for money had and received; and (4) whether sufficient evidence supported the damages awarded on DDK's claim for conversion.

38

A. Breach of Contract Damages

Dimitri argues the $3,085,000 awarded by the jury against him on Kirk's derivative claims for breach of contract must be reversed because there was no proximate causation between those damages and Dimitri's breach. In support of this argument, Dimitri advances a broad rule that a "general decline in the market value of real estate" can never be causally related to a breach of contract because market value declines are not reasonably foreseeable. We conclude, under the facts of this case, the jury's award is supported by the record.

The measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) The purpose is " 'to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract.' " (*Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 409.) "This means that recoverable damages are those that could fairly and reasonably be seen as arising naturally from a breach. [Citation.] This includes those that *should have* been reasonably contemplated or foreseen in light of all of the known facts or facts that the breaching party should have known, at the time of contracting. [Citations.] Thus, if the occurrence of these damages is sufficiently predictable to the parties when contracting, it can be assumed that the parties contemplated them." (*Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 469.)

39

"[W]hile a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment." (*Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 594.) Damages can be an approximation if a reasonable basis for computation is available. (*Israel v. Campbell* (1958) 163 Cal.App.2d 806, 816.)

The record does not establish exactly how the jury reached the amount of damages it awarded on the breach of contract claim. Kirk presented evidence concerning a number of different elements from which the damages could have been computed, including lost profits caused by Dimitri's delay for both the Monserate Hill lots and one of the Rod Street lots, the loss of value to the 10-acre Monserate Hill lot as a result of DDK's failure to subdivide, increased interest owed by DDK as a result of Dimitri's delay, the increased cost of development resulting from delay (specifically the requirement that a fire protection plan be submitted to the County), and losses DDK sustained on the avocado grove.

Dimitri argues the jury's award was based on lost profits presented in part by Kirk's appraisal expert, Randy Tagg, and contends these damages were too speculative to support the jury's award. The lost profit damages Dimitri challenges consist of the difference in either Tagg's valuation of the properties in February 2007, assuming the 10-acre lot was split, or offers on the lots DDK rejected, and Tagg's valuation of the properties in September 2009. Tagg testified DDK lost profits of $475,000 on Monserate

40

Hill lot 5 (the difference between a rejected offer of $775,000 in March 2005 and the expert's valuation of $300,000 in 2009), $500,000 on Monserate Hill lot 6 (the difference between an $800,000 offer rejected in July 2006 and the expert's valuation of $300,000 in 2009), $475,000 on Monserate Hill lot 7 (the difference between Tagg's appraisals of $900,000 in 2007 and $425,000 in 2009), and $1,550,000 in lost profits on the 10-acre Monserate Hill lot (the difference between Tagg's appraisals of $2,000,000, with the assumption the subdivision was completed, in 2007 and his appraisal of $450,000, as is, in 2009). Dimitri also points to lost profits of $85,000 on the Rod Street lot based on the $1,050,000 offer he rejected to prevent an increase in value to Diffendale's membership interest, versus the actual sales price of $965,000. The total of this lost profit evidence equals the jury's award of $3,085,000.

Dimitri relies on *Safeco Ins. Co. v. J & D Painting* (1993) 17 Cal.App.4th 1199 to support his argument that his conduct was not causally related to these damages. In *Safeco*, the plaintiff's house was damaged by a fire. In addition to the cost of repair, the plaintiff also sought to recover damages for the decline in the market value of the house while it was being repaired. (*Id*. at p. 1202.) The court held damages for the loss in value were not recoverable because they were not proximately caused by the defendant's negligent act of starting the fire. (*Id*. at pp. 1204-1205.) "A superseding cause utterly unrelated to the defendant's negligence breaks the chain of proximate causation and is a bar to recovery." (*Id*. at p. 1204.) The court noted: "This case is different from slander of title or wrongful attachment cases, in which plaintiffs have been awarded the

41

difference in market value between the time of imposition of a lien and the time of its lifting [citations] because in those cases the defendant acted intentionally to adversely affect the marketability of a property, and therefore the decline in market value may be seen as proximately related to the tort." (*Id.* at p. 1205, fn. omitted.)

Here, Dimitri's intentional delay in the development and sale of the properties, which he concedes the jury found to be a breach of his agreements with DDK, directly adversely affected the ability of DDK to sell the various properties. Dimitri was experienced in buying and selling real estate when he met Kirk and understood the importance of timing in the real estate market. At the time of contracting, Dimitri was aware of the favorable market conditions that existed and expressed his commitment to moving quickly on the Monserate Hill project to take advantage of those conditions. Unlike *Safeco*, in which the defendant's negligent conduct bore no direct relationship to the damages sought, Dimitri's delay had a direct relationship to the lost profits caused by declining real estate values in the time he delayed.

Dimitri contractually agreed not to delay development and sale of the properties and to pay damages to DDK if he did so. The anticipated profits from a timely sale of DDK's properties, as well as the risks posed by a decline in the market, were inherent in these promises. (See *James v. Herbert* (1957) 149 Cal.App.2d 741, 749 ["Profits are part and parcel of the contract itself . . . . They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement."].) Damages would arise only if the market

42

declined. At the time Dimitri entered into the DDK agreements, lost profits resulting from a declining market were a reasonably foreseeable consequence of Dimitri's delay and were properly awarded by the jury.

None of the other cases Dimitri relies on foreclose this conclusion. In *Movitz v. First Nat. Bank of Chicago* (7th Cir. 1998) 148 F.3d 760, the plaintiff, purchaser of a commercial building, sued the bank that recommended the purchase, alleging the bank misrepresented the value of the building. (*Id*. at p. 762.) Shortly after the sale, the real estate market collapsed. (*Ibid.*) The jury award included the $2.2 million cost of the building plus another $800,000 paid in an unsuccessful attempt to avoid foreclosure. (*Id*. at p. 761.) The Seventh Circuit, applying Illinois law, overturned the jury's verdict, holding the damages were not proximately caused by the bank's misrepresentations. Instead, the damages awarded were the result of a poor commercial real estate market at the time and no evidence supported the plaintiff's claim that the entire damages award was a result of the bank's conduct. (*Id*. at pp. 764-765.) In contrast, Dimitri was under a contractual duty not to unreasonably delay the development and sale of the properties, and the lost profit damages were directly caused by the breach of this duty.

*First Federal Sav. and Loan Ass'n of Rochester v. Charter Appraisal Company, Inc.* (1999) 247 Conn. 597 involved a bank's claim against an appraiser who negligently issued an appraisal report on a residential property for an amount above its market value. The bank relied on the report in its underwriting determination. When the home mortgage was foreclosed and the house sold for less than the value of the mortgage, the

bank sought damages against the appraiser that included a general market decline since the time of his report. The court declined to award those damages. It held the appraiser had no duty to insure the bank against general market decline, but only for "costs that the bank would have avoided 'but for' the negligent appraisal." (*Id*. at p. 607.) "Put differently, a fall in market values was not within the scope of risk created by the negligently conducted appraisal." (*Ibid*.; see also *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP* (2004) 336 Or. 329, 348 [defendant accountant in tort action brought by corporate client had no special duty to protect plaintiff against market fluctuations in plaintiff's stock price].) Here, Dimitri had a contractual duty to insure DDK against losses resulting from the market downturn during the time his conduct delayed the development and sale. The fall in market values was within the scope of risk created by Dimitri's breach. The jury's damages award on DDK's breach of contract claim was proper.

     B. <u>MBK's Breach of Contract Claim -- Contractor's License</u>

     The jury awarded MBK damages of $300,000 against DDK for breach of the construction management agreements for the development of the Rod Street and Monserate Hill projects. "When a contractor sues to recover compensation for work requiring a contractor's license, Business and Professions Code section 7031 requires the contractor to allege that he or she 'was a duly licensed contractor at all times during the performance of that act or contract.' ([Bus. & Prof. Code,] § 7031, subd. (a).)" (*Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621, 624, fn. omitted

(*Advantec*).)  If the issue of licensure is "controverted" by the defendant, then the contractor must prove licensure by producing a verified certificate from the Contractor's State License Board.  (Bus. & Prof. Code, § 7031, subd. (d); *Advantec*, at p. 624.)  "When licensure . . . is controverted, the burden of proof to establish licensure . . . shall be on the licensee."  (Bus. & Prof. Code, § 7031, subd. (d).)  Dimitri contends reversal of the judgment is required because MBK did not show it was licensed under Business and Professions Code section 7031.  We agree with the trial court's finding MBK's licensure was not controverted and, therefore, no license showing was required.

MBK's cross-complaint against DDK alleged MBK was "a California general contractor, licensed at all times relevant herein by the State of California, Department of Consumer Affairs, License No. 764542."  Dimitri answered on behalf of DDK in the form of a general denial, stating, "Cross-Defendant denies each and every allegation contained in the Cross-Complaint, and the whole thereof, and each and every alleged cause of action asserted against Cross-Defendant therein . . . ."  However, Dimitri's cross-complaint against MBK (and Kirk) for breach of the construction management agreements expressly alleged: "At all relevant times, MBK, INC[.,] was a licensed general building contractor, with [Kirk] registered as the responsible managing officer."

During discovery, MBK propounded form interrogatories to DDK, including a request for DDK to "identify each denial of a *material* allegation and each special or affirmative defense in your pleadings and for each, (a) state all facts upon which you base the denial . . . ."  Dimitri's response on behalf of DDK stated it "denie[d] all of the

45

allegations in the Cross-Complaint," and provided specific facts explaining its denial of certain substantive allegations. No facts concerning its denial of MBK, Inc.'s allegation it was a licensed contractor at all relevant times were provided.

Dimitri raised MBK's licensure for the first time after the close of evidence by his submission of a "Memorandum of Points and Authorities in Support of Motion for Directed Verdict." Dimitri argued MBK did not meet its burden of proof under Business and Professions Code section 7031. At the hearing on Dimitri's motion, MBK's attorney stated she had the "verified certificate from the contractors license board . . . . [¶] . . . If the dispute had arisen in trial, this could have come in. And I have it in my hands." The court declined to rule on the request, but asked MBK's counsel whether, if the court allowed evidence to be reopened, she "would put in [her] proof of the contractor's license . . . ." Counsel responded that she would.

Dimitri renewed his request for a directed verdict on this issue in a postverdict motion for directed verdict. The trial court denied the request, finding "the issue was not 'actually controverted' based upon the allegations in Dimitri's operative complaint and the discovery responses exchanged during [pretrial] discovery." Dimitri renews his argument here, relying on *Advantec* and the "strong public policy against recovery by an unlicensed contractor" (as he did in the trial court) for the proposition that his general denial of MBK's licensure allegation in its complaint was sufficient to controvert licensure.

The *Advantec* court affirmed the plaintiff's motion for nonsuit granted by the trial court based on the defendant/cross-complainant subcontractor's failure to prove his

46

licensure. (*Advantec*, *supra*, 153 Cal.App.4th at p. 632.) Advantec (a general contractor) answered the subcontractor's allegation that the subcontractor was licensed (therefore entitled to payment under his agreement with Advantec) by way of a general denial. (*Id.* at p. 625.) The subcontractor argued the general denial was insufficient to controvert his license. The court disagreed, holding the general denial was sufficient to controvert licensure and the subcontractor was, therefore, required to produce at trial a verified certificate of licensure from the Contractors' State License Board. (*Id.* at p. 627.)

Unlike MBK, the subcontractor in *Advantec* did not seek to clarify whether the plaintiff intended to contest licensure during discovery. (*Advantec*, *supra*, 153 Cal.App.4th at p. 631 [subcontractor "could have clarified by way of contention interrogatories whether Advantec intended to contest the validity of its license, but it did [not]"].) MBK propounded interrogatories requesting the identification of each material allegation DDK denied and a statement of the facts on which the denial was based. In response, Dimitri did not identify MBK's licensure.

Further, Dimitri's cross-complaint, which alleged MBK was "[a]t all relevant times, a licensed general building contractor," directly contradicted his later contention MBK was not licensed. This allegation constituted a judicial admission, which negated MBK's obligation to prove its licensure. (See *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1155 ["[T]he trial court may not ignore a judicial admission in a pleading, but must conclusively deem it true as against the pleader."].) Dimitri seeks to avoid the binding nature of this judicial admission in three

47

ways. He contends the allegation was not binding because it (1) was made on information and belief and was equivocal; (2) involved mixed questions of law and fact; and (3) was contested by way of MBK's answer in the form of a general denial. We are not persuaded by these arguments.

First, the allegation was not made on information and belief. In contrast to other allegations in Dimitri's cross-complaint, the allegation that MBK was a licensed contractor is not prefaced with "cross-complainant is informed and believes, and based thereon alleges . . . ." Further, the allegation is not equivocal in any way; it states a simple fact, capable of one meaning: MBK is licensed. (Cf. *Stroud v. Tunzi* (2008) 160 Cal.App.4th 377, 385 [no binding judicial admission based on statement by party that could be construed in multiple ways, made at a hearing before initiation of lawsuit].) Second, and similarly, the allegation is factual, not legal, in nature. Although the truth of the fact has legal significance, it is not a legal assertion.

Third, we reject Dimitri's argument that MBK's general denial of the claims in the cross-complaint did not negate Dimitri's admission. In contrast to MBK's allegation it was licensed, essential to its claim against DDK for breach of contract, Dimitri's allegation MBK was licensed was not material to any of its claims. MBK's general denial did not controvert this nonmaterial allegation and, therefore, had no impact on Dimitri's admission MBK was licensed. (See Code Civ. Proc., § 431.30, subd. (d) ["a general denial is sufficient but only puts in issue the material allegations of the complaint"]; *Advantec*, 153 Cal.App.4th at p. 627 ["[t]he effect of a general denial is to

48

'put in issue the material allegations of the complaint' "].) Dimitri, on behalf of DDK, is not entitled to reversal of the judgment on MBK's breach of contract claim.

### C. Money Had and Received

Dimitri argues the evidence is insufficient to support the $95,607.72 portion of the jury's verdict entered by the judgment against him on DDK's claim for money had and received. The record does not substantiate this argument. At trial, Kirk presented evidence the payment to Dimitri by DDK was a mistake resulting from Dimitri's confusion about a nullified provision of the DDK operating agreement. At the beginning of the relationship, Dimitri contemplated that DDK would purchase all six of the Rod Street lots Kirk had placed in escrow. Kirk wanted one of the lots, Lot 6, to develop for his own residence. In exchange for DDK's agreement to give Kirk Lot 6, Kirk agreed Dimitri would receive 100% of the profits on his choice of Lots one through four and this term was incorporated into the DDK operating agreement. Ultimately, DDK decided not to purchase Lot 6, and Kirk bought the property himself. As a result, the related term of the operating agreement was crossed out by Kirk and Dimitri in a subsequent version of the document.

Kirk testified the $95,607.72 check was issued to Dimitri at the request of Dimitri's accountant, Patrick Leone. The day DDK wrote Dimitri the check, Kirk questioned Leone about the transaction, but Leone did not provide a clear explanation, saying only "everything would balance itself out." Later, Kirk asked Dimitri what the check was for and Dimitri told him it was his share of profits on the Rod Street project.

49

Kirk testified he later came to understand Leone believed Dimitri was entitled to this amount as profit under the nullified provision of the operating agreement. After Kirk figured out this mistake he asked Dimitri to return the money, but Dimitri refused. Dimitri testified when he received the check in August 2006, he did not know what it was for, and thought it was a mistake.

To rebut this evidence, Dimitri presented e-mail communications between Leone and Kirk in April 2007, in which Leone asked Kirk to explain the crossed-out provision of the operating agreement. Kirk responded he agreed to Dimitri receiving 100 percent of the profits on one of the lots in exchange for Dimitri's and Diffendale's agreement that he be able to purchase lot 6. Dimitri argues this e-mail, written after the check was issued and the provision stricken on the document, contradicted Kirk's trial testimony that the provision had been abandoned by the parties. During his cross-examination of Kirk at trial, Dimitri's counsel pointed out the discrepancy but did not provide Kirk with an opportunity to explain. Kirk's counsel did not redirect Kirk on the point.

When an appellant asserts there is insufficient evidence to support the trial court's factual finding, we apply the substantial evidence standard of review. "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every

50

reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

Kirk showed the payment to Dimitri was made in error based on the nullified provision of the operating agreement. Although the e-mail and Leone's related testimony could support an inference Kirk believed Dimitri was entitled to the payment, no witness testified that the agreement had not been changed. At most, the evidence was conflicting. It did not negate Kirk's evidence, which we conclude was sufficient to support this portion of the judgment. (See *Milton v. Perceptual Development Corp.* (1997) 53 Cal.App.4th 861, 867 ["If the evidence gives rise to conflicting inferences, one of which supports the trial court's findings, we must affirm."].)

D. Conversion

Dimitri argues for a reversal of $17,740 of the $20,240 awarded to DDK on Kirk's derivative conversion claims based on his contention that this portion of the judgment was not supported by substantial evidence. The damages awarded on the conversion claim consisted of (1) five checks written by West Pak to Dimitri, totaling $13,741, as payment for avocados it purchased from DDK, and (2) seven $1,000 kickback payments Dimitri received from DDK's landscaper, Arturo Aguirre. With respect to the $13,741 in West Pak checks, Dimitri contends there was no conversion because Kirk did not show he objected to Dimitri taking the proceeds of the avocado sales to West Pak. As for the remaining $4,000 he challenges, Dimitri does not deny Aguirre paid him $7,000 in

51

kickbacks. Instead, he argues one of the invoices was not actually padded and for three others (which were padded) the work underlying the kickback was unrelated to DDK.

Conversion is the wrongful exercise or command over the property of another. (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451.) The elements of a conversion action are: (1) the plaintiff's ownership or right to possession of the property at the time of conversion; (2) the defendant's conversion by a wrongful act or disposition of the property rights; and (3) damages. (*Ibid*.) The plaintiff must also prove it did not consent to the defendant's exercise of control. (*Farrington v. A. Teichert & Son* (1943) 59 Cal.App.2d 468; see also CACI No. 2100 [listing plaintiff's lack of consent as an element of conversion]; *Tavernier v. Maes* (1966) 242 Cal.App.2d 532, 552 ["As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort."].)

Dimitri's claim that Kirk consented to Dimitri taking the payments from West Pak is not supported by the record. Kirk testified he learned about the payments West Pak made directly to Dimitri only after he noticed the amount of fruit leaving the grove seemed to be greater than the amount for which DDK was being paid. When Kirk asked Dimitri to check with West Pak to ensure the payments were accurate, Dimitri responded he was watching things closely and there was no missing fruit. Shortly after that conversation, Dimitri brought checks from West Pak totaling $13,741 into DDK's office and allowed the office manager, Robin Peters, to make copies of the checks. Dimitri told Peters he was taking the proceeds from the checks for himself. Kirk testified he was

52

furious when he learned from Peters that Dimitri had taken this money. This evidence contradicts Dimitri's claim Kirk did not object to Dimitri's actions and was sufficient to support the jury's verdict awarding DDK damages for conversion of the West Pak payments. (See *Wade v. Southwest Bank* (1962) 211 Cal.App.2d 392, 406 [consent requires a " ' "a voluntary agreement" ' "; passive assent is insufficient].)

We also reject Dimitri's claim that $4,000 of the conversion award for kickbacks was not supported by the evidence. Aguirre testified he kicked back $1,000 to Dimitri on each of seven jobs Kirk hired him for. According to Aguirre, five of the jobs were on the Rod Street and Monserate Hill projects. Dimitri claims, without citation to the record, that only four of the jobs were related to Rod Street and Monserate Hill, and Aguirre did not pad the invoice for one of these jobs. He claims the three other kickbacks related to jobs that were not for DDK.

As noted, the record supports $5,000 of the conversion claim for the kickbacks Dimitri received on Aguirre's work on the Rod Street and Monserate Hill projects. As for the $2,000 in kickbacks on Kirk's projects outside of DDK, we agree the evidence showed Kirk (or his other development companies), not DDK, paid the kickbacks Aguirre gave to Dimitri. However, evidence concerning other money taken from DDK by Dimitri, including the payment of more than $2,000 in legal fees for work that benefitted Dimitri personally, supported the jury's award on DDK's conversion claim. Substantial evidence supports the portion of the judgment against Dimitri awarding damages to DDK for conversion.

53

IV

ATTORNEY FEE AWARD

Kirk challenges various aspects of the court's attorney fee award. He argues the court abused its discretion by not finding DDK was a prevailing party against Dimitri and by ordering DDK, not Dimitri, to pay attorney fees to Kirk. Kirk also argues the court erred by awarding attorney fees and costs to Dimitri and Paula. Paula also appeals, contending the court abused its discretion by ordering Kirk alone, and not Kirk and DDK jointly and severally, to pay her attorney fees.

Kirk, Dimitri and Paula each brought motions seeking an award of attorney fees. Kirk's motion was based on the attorney fee provisions contained in the DDK operating agreement, while Dimitri's and Paula's motions were premised on attorney fee provisions contained in the agreements setting forth the terms of promissory notes between DDK and the Dimitri family trust. The parties agree these contract provisions support an award of attorney fees under Civil Code section 1717.

Under this statute, "upon notice and motion by a party, [the court must] determine who is the party prevailing on the contract . . . ." (Civ. Code, § 1717, subd. (b)(1).) "When a party obtains a simple, unqualified victory by completely prevailing on or defeating all contract claims in the action . . . , [Civil Code] section 1717 entitles [that] party to recover reasonable attorney fees incurred in prosecution or defense of those claims." (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109.) If no party "achieves a complete victory on all the contract claims, it is within the discretion of the trial court to

determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees." (*Ibid*.) To make this determination the trial court compares "the relief awarded on the contract . . . claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 (*Hsu*).)

"[*I*]*n determining litigation success*, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' For example, a party who is denied direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the party has otherwise achieved its main litigation objective." (*Hsu, supra*, 9 Cal.4th at p. 877.) We review a trial court's grant of attorney fees for abuse of discretion. "Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

Here, after noting the case "involved multiple separate contract actions," the court found "[e]ach party was successful on some of the separate and distinct contract actions, which each had an attorney[] fees clause," but that it was "virtually, if not actually, [impossible] to break down which fees were incurred by which party, for which

55

contract." Despite this statement, the court awarded fees to MBK, Kirk, Paula and Dimitri.

Kirk contends the court erred by not identifying or analyzing "who was the 'prevailing party' in this litigation," and by awarding fees arbitrarily. He argues that between Dimitri, Kirk and DDK, Kirk and DDK were prevailing parties entitled to attorney fees under Civil Code section 1717. Dimitri counters the awards should be affirmed on the grounds the court considered nine separate agreements and awarded attorney fees (or appropriately declined to do so) to the prevailing parties on each of those nine agreements.

With respect to the attorney fee award of $350,000 to Kirk against DDK, we conclude the record does not support the court's implied finding that Kirk was a prevailing party against DDK.[7] Kirk did not bring any claims against DDK. He successfully brought claims against Dimitri on behalf of DDK. Dimitri points out that he brought claims on behalf of DDK against Kirk and that Kirk successfully defended against those claims. Accordingly, Dimitri argues, Kirk was a prevailing party against DDK and the court's award of fees to Kirk against DDK was mandatory. Kirk's motion for attorney fees, however, sought an award of fees solely against Dimitri. Kirk did not seek an award of fees against DDK; to the contrary, Kirk sought fees against Dimitri on behalf of DDK. We see no rational basis for the court's award of $350,000 in attorney

---

7    The court's award does not specify who the prevailing party was as to the various agreements.

fees to Kirk against DDK and, therefore, find the award was an abuse of discretion. That award is reversed.

With respect to Kirk's challenge to the court not awarding any attorney fees to DDK, we agree DDK was a prevailing party under the applicable attorney fee provision. DDK was awarded $3,085,000 for its breach of contract claims against Dimitri. The jury found in Kirk's favor on all of Dimitri's breach of contract claims against him. On this record, DDK met its litigation objectives against Dimitri and indisputably "obtained the greater relief on the contract." (*Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1541; see also *id*. at p. 1541 ["[a]lthough a trial court has broad discretion to determine the prevailing party in a mixed result case, its discretion is not unlimited"]; and *Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394, 1398 ["Typically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought."].)

The trial court recognized DDK's victory, stating in its ruling "one party did receive a substantial verdict on some of the claims." However, the court also stated the verdict "will be offset against the money owed by the [LLC] to Dimitri, resulting in a virtual wash according to Plaintiff's counsel." Kirk did not argue the offset resulted in a "wash" for purposes of determining the prevailing party under Civil Code section 1717 on DDK's breach of contract claims. Rather, Kirk's offset arguments related to the merits

57

of his claim for specific performance of Dimitri's obligation to continue to fund the Monserate Hill project.

Further, in the trial court Dimitri did not dispute DDK was the prevailing party against him on its breach of contract claims. At oral argument on the attorney fee motions, Dimitri's counsel stated: "I don't think we're taking the position that as between [DDK] and Guido Dimitri individually, that Dimitri is the prevailing party. [¶] . . . [¶] From Mr. Dimitri's point of view it's not a zero recovery when he's giving up over $3 million of his notes. . . . [¶] [I]n terms of determining who is the prevailing party as between [DDK] and Guido Dimitri, the offset doesn't affect that determination." Additionally, Dimitri's proposed judgment, entered by the court, awarded costs to DDK as the prevailing party against Dimitri.

Despite this concession, Dimitri now argues the court had discretion to find DDK was not a prevailing party because the offset award meant DDK only received mixed results on its contract claims. We are not persuaded. The offset award, now remanded, did not cancel DDK's litigation victory on its contract claims against Dimitri. Rather, as Dimitri's counsel recognized at the hearing, the offset transferred money DDK owed to Dimitri's family trust to Dimitri to settle his obligation to pay the damages awarded to DDK.

We decline to adopt Dimitri's strict dissection of the breach of contract claims related to the DDK operating agreement. (See *Hsu, supra*, 9 Cal.4th at p. 877 [declining to adopt an overly rigid prevailing party determination and holding courts "should be

58

guided by 'equitable considerations' "].)  Dimitri agreed all breach of contract claims

submitted to the jury would be resolved together using a special verdict form that did not

distinguish between the various claims.  Dimitri cannot separate claims at this stage to

support his contention the results between Dimitri and DDK were mixed.  (See *Silver*

*Creek, LLC v. Blackrock Realty Advisors, Inc., supra*, 173 Cal.App.4th at p. 1540 [trial

court "oversimplified its duties by counting the number of contract claims presented and

essentially declaring a tie"].)  The trial court's denial of Kirk's request for specific

performance of Dimitri's obligation to continue to fund the Monserate Hill project

pursuant to the DDK operation agreement also did not cancel DDK's victory.  This relief

would have been duplicative of the damages awarded.

On this record, it was error for the court to find DDK was not a prevailing party

against Dimitri on its breach of contract claim.  We remand the matter for the court to

determine the amount of reasonable attorney fees to be awarded to Kirk, on behalf of

DDK, against Dimitri on this claim.

Kirk also challenges the $120,000 attorney fee awards each to Dimitri and Paula.

Dimitri argues these awards are supported because he and Paula were the prevailing

parties on each of DDK's claims related to the promissory notes.  Because each

promissory note contained its own attorney fee provision, a separate prevailing party

determination for the claims related to those notes was appropriate.  (See *Arntz*

*Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 491

["[w]hen an action involves multiple, independent contracts, each of which provides for

attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action"].)

Dimitri contends he and Paula were prevailing parties with respect to those provisions because the court rejected Kirk's claims for equitable reformation and allowed the principal and interest due on the notes to be offset against the jury's verdict. As discussed, we are remanding Dimitri's request for equitable offset to the trial court for a determination of the amount of interest on each promissory note that can be offset against the judgment considering the jury's factual findings. A finding on remand by the trial court that some or all of the interest is not appropriately awarded as offset to Dimitri necessarily will impact the prevailing party determination under the attorney fee provisions of the notes. (See *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [an order awarding costs, including attorney fees, " 'falls with a reversal of the judgment on which it is based' "].) The attorney fee awards to Dimitri and Paula are reversed. Reversal moots Paula's appeal seeking to modify her attorney fee award to be against Kirk and DDK, jointly and severally.

DISPOSITION

With respect to DDK's claim for intentional misrepresentation and punitive damages, the judgment is reversed and the trial court is directed to enter judgment in favor of DDK on these claims for $243,000 and $2.5 million, respectively, retroactively to May 10, 2010. With respect to the judgment awarding Dimitri an offset, the issue is

60

remanded with directions to determine the appropriate amount of interest that can be awarded to Dimitri, considering the jury's factual findings.

With respect to the portion of DDK's claim for money had and received reduced by the trial court on Dimitri's request for directed verdict, the judgment is reversed and increased to $362,000 retroactively to May 10, 2010. If, however, the court determines Dimitri is not entitled to offset the accrued interest of $245,046 the jury awarded DDK on its claim of money had and received, the judgment on this claim must be $116,954 retroactively to May 10, 2010.

The court's awards of attorney fees to Kirk, Dimitri and Paula are reversed. On remand, the court is directed to determine the reasonable amount of attorney fees to award Kirk, on DDK's behalf, against Dimitri on the breach of contract claim. The judgment and attorney fee awards are otherwise affirmed. The parties shall bear their own costs on appeal.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

61